IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:13-cv-81088-XXXX

| | |
|---|---|
| PICTET OVERSEAS INC., | § § § |
| Plaintiff, | § § |
| v. | § § |
| HELVETIA TRUST and AAA GROUP INTERNATIONAL TRUST, | § § § § |
| Defendants. | § § |

**PLAINTIFF'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION
AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, Pictet Overseas Inc. ("Pictet Overseas"), moves pursuant to Federal Rule of Civil Procedure 65(a) for a Preliminary and Permanent Injunction against defendants Helvetia Trust and AAA Group International Trust (collectively, "Defendants" or the "Trusts") to prevent them from pursuing their claims in an improper forum provided by the Financial Industry Regulatory Authority ("FINRA").  Defendants commenced the arbitration, styled *Helvetia Trust et al. v. Philippe Bertherat et al.*, Case No. 13-02053 (the "Arbitration"), and named Pictet Overseas, multiple affiliated and unaffiliated entities, and several individuals as respondents. FINRA administrative staff granted Defendants' request to expedite the Arbitration prior to notifying Pictet Overseas of the existence of the Arbitration.  Because Defendants were never customers of Pictet Overseas and there was no arbitration agreement between Defendants and Pictet Overseas, there is no basis for the Defendants to invoke FINRA jurisdiction and purport to pursue claims against Pictet Overseas in the Arbitration.  Pictet Overseas moves for a

preliminary and permanent injunction to preclude Defendants from pursuing their claims in the FINRA forum.  In support of this Motion, Pictet Overseas submits the instant Memorandum of Law.

I.      **INTRODUCTION**

FINRA requires its members to submit to arbitration to resolve claims brought by claimants, but only if the claimant is the member's "customer" under FINRA Rule 12200, or if the member has explicitly agreed to arbitrate disputes between the claimant and the member. Here, the Defendants are neither "customers" of Pictet Overseas nor is there any agreement to arbitrate.  The injunction should issue.

Defendants named no fewer than sixteen different parties as respondents in their amended statement of claim (the "Statement of Claim") which they submitted to FINRA on or about July 15, 2013. Among them, Defendants named Pictet Overseas which is a Canadian corporation, FINRA member, and broker dealer registered with the Securities and Exchange Commission (the "SEC") and based in Montreal, Canada.[1]

Pictet Overseas first learned of the existence of the Arbitration when it received the Statement of Claim from FINRA on or about September 23, 2013.  Pictet Overseas immediately determined that the claimants in the Arbitration (the Defendants in this action) are not (and never were) "customers" of Pictet Overseas within the meaning of FINRA's rules or indeed in any sense whatsoever.  Pictet Overseas had not even heard of the Defendants until September 2013 and it obviously never agreed to arbitrate disputes with them.  Defendants were and remain complete strangers to Pictet Overseas.

---

[1]    Aside from Pictet Overseas, the respondents in the Arbitration include: several of Pictet Overseas' indirect corporate affiliates which are not FINRA members; an unaffiliated entity that happens to have the name "Pictet" in its title; and several individuals who have interests in certain of the affiliated entities.

2

Accordingly, Pictet Overseas asks this Court to issue a preliminary and permanent injunction staying the Arbitration for the simple reason that Defendants cannot purport to invoke FINRA jurisdiction for their claims. As noted, Defendants are not customers of Pictet Overseas and there is no contract of any kind between them, let alone an agreement to arbitrate in a FINRA forum. Pictet Overseas has nothing whatsoever to do with Defendants or the Trustees.

The elements for an injunction are satisfied. Pictet Overseas has a high likelihood of success on the merits because Defendants are not (and never were) customers of Pictet Overseas; thus, this dispute is not subject to mandatory arbitration. Further, Pictet Overseas never agreed to arbitrate with Defendants. As a matter of law, Pictet Overseas would suffer immediate and irreparable harm if it were forced to arbitrate. Finally, the equities and public policy considerations tip in Pictet Overseas' favor because parties should not be forced to arbitrate unless they agree to do so. The Court should grant the motion for a preliminary and permanent injunction.

## II. FACTUAL BACKGROUND

The facts underlying this action can be briefly stated. According to the documents attached to their Statement of Claim,[2] Defendants are two St. Lucia Trusts that entered into a relationship with an investment manager, Horizon Global Advisors Ltd. and/or Horizon Global Advisors, LLC (collectively, "Horizon"), through Horizon's principal, Brian Callahan ("Callahan"). Defendants apparently made certain investments through Horizon that were held in a custodian bank in Switzerland, Pictet & Cie, an indirect affiliate of Pictet Overseas. In May 2012, the SEC initiated civil regulatory proceedings against Horizon and Callahan and, as part of those proceedings, obtained an order freezing all investor funds. Callahan had allegedly created

---

[2] Pictet Overseas does not admit the truth of any allegations in the Statement of Claim and will respond to the allegations as necessary at the appropriate place and time.

3

and operated a Ponzi scheme to defraud investors like the Defendants. See generally, First Amended Complaint in *SEC v. Callahan, et al.*, No. 12-cv-1065 (E.D.N.Y. May 31, 2012) (the "SEC Complaint"), which Defendants attached to the Statement of Claim. The SEC Complaint makes no mention of Pictet Overseas, or indeed any Pictet entity at all.

Defendants have named sixteen different individuals and entities as respondents in the Arbitration, including Pictet Overseas. In their Statement of Claim, Defendants never explain why it is that Pictet Overseas should be a party in the Arbitration. Defendants simply list a string of separate Pictet entities (and one unaffiliated entity with "Pictet" in its name), "define" them collectively as "Pictet," and then disingenuously assert that "Pictet" had something to do with Callahan's fraud.[3]

The Statement of Claim is largely unintelligible. As best can be discerned, the core claim seems to be that "Pictet" mishandled Defendants' offshore accounts. Yet even a brief review of the materials attached to the Statement of Claim makes it clear that Defendants opened custodial accounts with Pictet & Cie in Geneva, not brokerage accounts with Pictet Overseas in Montreal. *See* Lê Declaration, Exhibits B and C. Defendants also attach materials indicating that they received account statements, but again, these materials are from Pictet & Cie. *Id.*, Exhibit E. And Defendants attach correspondence that they exchanged with Pictet & Cie in Geneva about their losses. *Id.*, Exhibit F.

Conspicuously absent from the materials Defendants attached to their Statement of Claim

---

[3] *See generally* Statement of Claim, attached as Exhibit A to the Declaration of Déodat Lê ("Lê Decl." or "Lê Declaration") (stating, in relevant part " . . . [Pictet] needs to return that money plus interest plus attorneys fees, plus RICO violations for aiding and abetting a fraud, money laundering and allowing their accounts to steal and be used for a ponzi [sic] scheme by their NY agent, essentially operating from the Continental USA with a disbarred FINRA member, thumbing their noses at FINRA by dealing with a FINRA convicted forger, embezzler and general overall crook . . . ."). Unfortunately, Defendants' failure to paginate the Statement of Claim makes it difficult to provide a more precise citation.

is even a single document indicating that they had any customer relationship of any kind with Pictet Overseas. The reason, of course, is that they are not – and never were – customers of Pictet Overseas. *See* Lê Decl., ¶¶ 5-8, 15-16. In the absence of a customer relationship with a FINRA member, Defendants cannot invoke FINRA rules to justify use of the FINRA forum. Further, Defendants have no arbitration agreement with Pictet Overseas. In fact, Pictet Overseas had never even heard of the Defendants until September 2013 when it received in the mail a copy of the Statement of Claim. *Id*., ¶¶ 4, 14-16.

Defendants have no basis for bringing Pictet Overseas into the Arbitration. There is no broker-customer relationship between Pictet Overseas and Defendants and no agreement to arbitrate. Pictet Overseas' injunction request should be granted.

### III.     ARGUMENT AND CITATION OF AUTHORITY

#### A.     Legal Standards For An Injunction And Determining Arbitrability.

In the Eleventh Circuit, an injunction is proper where the movant demonstrates that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *ACLU v. Miami-Dade Cty*., 557 F.3d 1177, 1198 (11th Cir. 2009) (citations and internal quotation marks omitted). Pictet Overseas satisfies each of these elements, and the preliminary injunction should be issued.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Perera v. H & R Block E. Enters. Inc.*, 914 F. Supp. 2d 1284, 1287 (S.D. Fla. 2012) (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). Where the issue is whether any agreement to

arbitrate exists, courts recognize that it is the district court, and not an arbitrator, that must make that threshold determination. *Wheat, First Sec. Inc. v. Green*, 993 F.2d 814, 819 (11th Cir. 1993) (Where the parties had "absolutely no relationship" at the time of the events sought to be arbitrated, "[T]he district court committed no error in deciding the arbitrability question. It had the responsibility to do so."); *see also Arlen House Condo. Assoc., Inc. v. Hotel Emps. & Rest. Emps. Int'l Union Local 355*, No. 06-21040-CIV, 2008 WL 4844109, *8 (S.D. Fla. Nov. 10, 2008) (unless the parties clearly provide otherwise, the question of whether the parties agreed to arbitrate should be decided by a judge).

Thus, this Court must first determine whether the parties have agreed to arbitrate. *Wheat, First*, 993 F.2d at 819. If, as here, no pre-dispute arbitration agreement exists, the Court must determine whether Defendants nevertheless can compel Pictet Overseas to arbitrate as "customers" of Pictet Overseas under the FINRA rules. *See* FINRA Rule 12200, a true and correct copy of which is attached as Exhibit A to the Declaration of Mark A. Salky ("Salky Decl." or "Salky Declaration").

  B. Pictet Overseas Has A Substantial Likelihood Of Success On The Merits.

    1. There is no agreement to arbitrate between Pictet Overseas and Defendants.

No written pre-dispute agreement to arbitrate exists between Defendants and Pictet Overseas, and Defendants do not make any claim to the contrary. *See* Lê Decl., Exhibit A. The Lê Declaration establishes that Defendants have never had an agreement to arbitrate with Pictet Overseas. *See* Lê Decl., ¶ 15.

    2. Defendants are not Pictet Overseas' "customers" for purposes of FINRA Rule 12200.

Nor can Defendants manufacture FINRA jurisdiction over Pictet Overseas based on the

fact that Pictet Overseas is a FINRA member. FINRA Rule 12200 provides that FINRA must arbitrate a dispute if and only if three conditions are satisfied:

- Arbitration under the Code is either:
    - Required by a written agreement, or
    - Requested by the *customer*;

- The dispute is between a *customer* and a member or associated person of a member; and

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

*See* Salky Decl., Exhibit A.

The Defendants are not "customers" of Pictet Overseas. While the FINRA Code fails to define the meaning of "customer" for purposes of Rule 12200 with precision, the term "customer" must be construed so as not to "upset the reasonable expectations of [FINRA] members." *Wheat, First*, 993 F.2d at 820; *BMA Fin. Servs., Inc. v. Guin*, 164 F. Supp. 2d 813, 818-19 (W.D. La. 2001); *see also, e.g.*, *SunTrust Banks, Inc. v. Turnberry Capital Mgmt. LP,* --- F. Supp. 2d ----, 2013 WL 2128340, *4 (S.D.N.Y. May 17, 2013) ("[T]he terms of the FINRA Code 'should be construed in a manner consistent with the 'reasonable expectations' of FINRA members[.]'") (internal citation omitted).[4]

In fact, courts in the Eleventh Circuit require a business or transactional relationship between the investor and either the firm or the firm's associated persons before finding a customer relationship. *Wheat, First*, 993 F.2d at 820 (finding that because investor did not hold accounts with registered broker-dealer at the time of the alleged wrongdoing, investor did not

---

[4] For the Court's convenience, copies of all unpublished cases cited in this Memorandum of Law are attached as Exhibit B to the Salky Declaration.

qualify as broker-dealer's "customer" under NASD rules); *Multi-Fin. Secs. Corp. v. King*, 386 F.3d 1364, 1368 (11th Cir. 2004) (finding customer relationship in the absence of a relationship between investor and broker-dealer *only* because investor was customer of firm's associated person); *MONY Secs. Corp. v. Bornstein*, 390 F.3d 1340, 1344 (11th Cir. 2004) (same).[5]  In *Wheat, First*, the Eleventh Circuit determined that investors could not compel a firm to arbitrate claims arising from alleged misrepresentations of individuals who had been employed by an entity that merged with the firm.  993 F.2d 814, 815-16 (11th Cir. 1993).  The *Wheat, First* court held that the investors and the member firm "had absolutely no relationship at the time of the alleged events that [the investors sought] to arbitrate."  *Id.* at 818.  Finding a customer relationship under such circumstances

> . . . would do significant injustice to the reasonable expectations of NASD members. We cannot imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer. The potential for abuse under this scheme is manifestly apparent . . . "

*Id.* at 820; *see also BMA Financial Services*, 164 F. Supp. 2d at 819 (rejecting boundless construction of "customer," stating that "[e]mbracing this definition would mean that any investor could be entitled to demand arbitration of a member firm regardless of whether the customer had any relationship… with the member firm, its associated persons, or the employees

---

[5]   Although *King* noted the broad customer definition, the court did not end the inquiry by simply determining that claimant was neither a broker nor dealer, but based its holding on the fact that the investor was a customer of the firm's associated person. *King*, 386 F.3d at 1368-69. Later cases have rejected the notion that *King* adopted a boundless interpretation of "customer." *See, e.g., Morgan Keegan & Co. v. Shadburn*, 829 F. Supp. 2d 1141 (M.D. Ala. 2011) (*King* stands only for the proposition that the customer relationship encompasses relationships with a firm's associated persons, whether or not known to the firm; accordingly, "the court declines to find that [defendant] is a "customer" of Morgan Keegan based solely on the fact that he is neither a broker nor a dealer").

8

with whom it intended to arbitrate…. Such a boundless definition would surely upset the reasonable expectations of NASD members").[6]

Likewise, courts in the Eleventh Circuit hold that a business or transactional relationship between the claimant and the firm (or its associated person, consistent with the principles from *Wheat, First* and *King*) is required for the claimant to be considered a "customer." *See, e.g.*, *O.N. Equity Sales Co. v. Stephens*, No. 4:07cv269, 2008 WL 835808 (N.D. Fla. Mar. 28, 2008) (finding firm must arbitrate because investor was the customer of its representative); *Hornor, Townsend & Kent, Inc. v. Hamilton*, No. 1:01-CV-2979-JEC, 2007 U.S. Dist. LEXIS 69662, at *9 (N.D. Ga. Sept. 6, 2007) (reaffirming *Wheat, First* and stating that "if the defendants were customers of a broker who was not associated with the plaintiff firm. . . then defendants cannot be considered to be customers of the firm under NASD and they cannot compel plaintiff to arbitrate their claim."); *Morgan Keegan & Co. v. Shadburn*, 829 F. Supp. 2d 1141, 1144 (M.D. Ala. 2011) (finding that investor who bought securities through another brokerage firm and claimed misrepresentations in the underwriting firm's marketing materials was not the underwriting firm's customer).

Here, Defendants have *never* been customers of Pictet Overseas, at any time; they never opened an account and they never received any investment or brokerage services, or indeed services of any kind, from Pictet Overseas. Lê Decl., ¶¶ 8, 12-16. Pictet Overseas had never

---

[6] Other courts, including the Fourth Circuit Court of Appeals, have explicitly rejected the notion that a party need only not be a broker or dealer in order to qualify as a "customer" because "[s]uch an interpretation . . . would be absurd." *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 356 (S.D.N.Y. 2010); *see also Morgan Keegan & Co., Inc. v. Silverman*, 706 F.3d 562, 566 (4th Cir. 2013) (declining "to adopt the broad scope of the term 'customer'" as anyone other than a broker or dealer); *SunTrust Banks, Inc. v. Turnberry Capital Mgmt. LP*, --- F. Supp. 2d ----, 2013 WL 2128340, *5 (S.D.N.Y. May 17, 2013) ("courts have held that the term 'customer' must have a more limited meaning than simply 'all entities other than brokers or dealers.'") (citation omitted).

even heard of the Defendants until it received a copy of the Statement of Claim.  Lê Decl. ¶ 14.

It appears that Defendants had some kind of custodial relationship with Pictet & Cie in Geneva, Switzerland.  *See* Lê Decl., Exhibits B and C.  Indeed, Defendants repeatedly wrote to Pictet & Cie in Geneva prior to commencing the Arbitration.  *Id.*, Exhibit F.  Notably, at no time between March 2012 and the filing of the Statement of Claim did Defendants ever contact Pictet Overseas, for the simple reason that they had no relationship whatsoever with that entity.

In just the last few years, district courts across the country have enjoined FINRA arbitrations rather than force a party to arbitrate claims it did not agree to arbitrate, brought by claimants who were not its customers.  *See, e.g.*, *Shadburn,* 829 F. Supp. 2d at 1144 (enjoining arbitration on finding that investor who bought securities through another brokerage firm and claimed misrepresentations in the underwriting firm's marketing materials was not the underwriting firm's customer); *see also Morgan Keegan & Co., Inc. v. Louise Silverman Trust*, No. Civ. JFM-11-2533, 2012 WL 113400 (D. Md. Jan. 12, 2012), *aff'd by* 706 F.3d 562 (4th Cir. 2013); *Morgan Keegan & Co., Inc. v. Agresti*, Civ. No. 11–5229 (PGS), 2012 WL 4505897, at *1 (D.N.J. Sept. 28, 2012); *Morgan Keegan & Co. Inc. v. Johnson*, No. 2:11CV502, 2011 WL 7789796 (E.D. Va. Dec. 22, 2011); *Morgan Keegan & Company v. McPoland,* 2011 U.S. Dist. LEXIS 140113, *10 (W.D. Wash. Dec. 6, 2011); *Morgan Keegan & Co., Inc. v. Jindra,* No. 3:11-cv-05704, 2011 U.S. Dist. LEXIS 135464, at *8 (W.D. Wash. Nov. 22, 2011); *Morgan Keegan & Co., Inc. v. Shorthouse,* No. C11-5734, 2011 U.S. Dist. LEXIS 135459 (W.D. Wash. Nov. 22, 2011); *Morgan Keegan & Co. v. Ras,* No. 5:11-cv-00352, at *3, 7-8 (E.D. Ky. Nov. 14, 2011); *Morgan Keegan & Co., Inc. v. Drzayick,* No. 1:11-CV-00126, 2011 WL 5403031, at *4 (D. Idaho Nov. 8, 2011); *Janney Montgomery Scott LLC v. Greenberg,* No. 10 Civ. 4248, 2010 U.S. Dist. LEXIS 67657, at *9 (S.D.N.Y. July 1, 2010); *UBS Secs. LLC v. Voegeli*, 684 F. Supp.

2d 351, 356 (S.D.N.Y. 2010), *aff'd* 10-0690-cv, 2011 U.S. App. LEXIS 58 (2nd Cir. Jan. 4, 2011); *Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759, 766-67 (N.D. Cal. 2008); *Goldman Sachs & Co. v. Becker*, No. C-07-01599, 2007 U.S. Dist. LEXIS 51359, at *16-17 (N.D. Cal. July 2, 2007).

In light of these authorities, Pictet Overseas has a very strong likelihood of success in establishing that Defendants' claims against it are not arbitrable. Pictet Overseas should not be forced to arbitrate.

    C.    Pictet Overseas Will Suffer Irreparable Harm If Defendants Are Not Enjoined From Proceeding With The Arbitration.

It is black letter law that requiring a party to proceed to arbitrate issues which are not subject to arbitration constitutes irreparable harm. *Dean Witter Reynolds Inc. v. Pollack*, No. 96–6397–CIV, 1996 WL 1044969, *4 (S.D. Fla. May 29, 1996); *Chase Manhattan Bank USA, N.A. v. Nat'l Arbitration Council, Inc.*, No. 3:04cv1205, 2005 WL 1270504, at *3 (M.D. Fla. May 27, 2005) ("Being compelled to arbitrate a claim in the absence of an agreement to arbitrate that claim constitutes an irreparable injury[.]") (citation omitted). A party "suffers irreparable harm when it is forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Shadburn*, 829 F. Supp. 2d at 1153 (citing *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)).

Pictet Overseas' forced participation in the arbitration of a dispute it has not agreed to arbitrate will cause it irreparable harm. Further, it bears noting that because of the limited appellate review of arbitrators' decisions, determining whether a party ultimately is before the court or an arbitrator is critical. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942

11

(1995). Pictet Overseas has the right to have its defenses determined in a court of law.[7] Accordingly, Pictet Overseas has established the element of irreparable harm for purposes of injunctive relief.

### D. The Balance Of Equities Favors Plaintiff.

Injunctive relief is appropriate and necessary because the balance of equities weighs in Pictet Overseas' favor. To determine whether the balance of hardships favors the moving party, courts must determine whether the injury threatened to the party seeking the injunction outweighs the threatened harm to the parties whose actions will be enjoined. *Shadburn*, 829 F. Supp. 2d at 1153. In similar circumstances, courts have held that any delay in adjudicating claims is outweighed by the irreparable injury that flows from forcing arbitration on a party that did not agree to it. *See, e.g., Pollack*, 1996 WL 1044969 at *4 (permitting arbitration on non-arbitrable issues to proceed would cause greater harm to plaintiff than a preliminary injunction enjoining arbitration); *Shadburn*, 829 F. Supp. 2d at 1153 ("[I]n light of Morgan Keegan's showing of a substantial likelihood of success that it cannot be forced to arbitrate the underlying dispute and the irreparable injury that flows from that forced arbitration, the harm to Morgan

---

[7] Preliminary and permanent injunctive relief is necessary to prevent Defendants from forcing Pictet Overseas to defend their claims in the FINRA Arbitration. Once Pictet Overseas' Answer is filed, FINRA will immediately initiate the arbitrator selection process and an initial pre-hearing conference will be scheduled shortly after the arbitrators are ranked and selected by the parties. In addition, Pictet Overseas will be forced to comply with other FINRA procedures governing disclosures and scheduling relating to the FINRA Arbitration. FINRA arbitration rules provide very limited grounds for pre-hearing motions to dismiss. *See* FINRA Rule 12504 ("Motion to dismiss a claim prior to the conclusion of a party's case in chief are discouraged in arbitration."). In the instances where such motions are allowed, they are often heard by panels during the final arbitration hearing, which occurs in many cases after over a year of costly litigation. In addition, FINRA arbitrators are not required to provide reasons for their decisions. By design, there are extremely narrow grounds on which to challenge an adverse arbitration award. FINRA's arbitration procedures simply do not protect Pictet Overseas from the irreparable harm of having to defend claimants' claims in an improper forum.

Keegan clearly outweighs the harm to [defendant]"). Absent an injunction, Pictet Overseas will be required either to respond to the Statement of Claim by November 4, 2013 or to default. So while Pictet Overseas is likely to suffer irreparable harm in the absence of an injunction, Defendants at worst will suffer only the inconvenience of pursuing their claims in a proper forum and against the proper parties. Thus, Pictet Overseas is entitled to injunctive relief.

E. An Injunction Is In the Public Interest.

One of the "threads running through federal arbitration jurisprudence is the notion that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotations omitted). The public has no interest in compelling arbitration of claims which are not subject to arbitration. *Pollack*, 1996 WL 1044969 at *4. Arbitration is in the public interest only when the parties have actually agreed to arbitrate; if they have not, the public has an interest in ensuring that the arbitration does *not* proceed. *Shadburn*, 829 F. Supp. 2d at 1153 (citing *Berthel Fisher & Co. Fin. Servs., Inc. v. Larmon,* No. 11–889, 2011 WL 3294682, at *2 (D. Minn. Aug. 1, 2011), "Public confidence in arbitration would be undermined if a party could be compelled to arbitrate without its consent."). The public interest is best served by avoiding the time and expense of a needless arbitration. *Shadburn*, 829 F. Supp. 2d at 1153. Accordingly here, where Pictet Overseas did not agree to submit to arbitration of Defendants' claims, an injunction is in the public interest.

IV. **CONCLUSION**

For the foregoing reasons, this Court should issue a preliminary and permanent injunction barring Defendants from prosecuting their claims in the Arbitration. Pictet Overseas respectfully requests the Court to (1) enjoin Defendants from proceeding with their claims in the Arbitration; and (2) grant Pictet Overseas any further relief it deems proper.

Dated: October 23, 2013

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

By: /s/ Mark A. Salky
MARK A. SALKY
Florida Bar No. 58221
Email: salkym@gtlaw.com
IAN M. ROSS
Florida Bar No. 91214
Email: rossi@gtlaw.com

**GREENBERG TRAURIG, LLP**
Terry R. Weiss
Florida Bar No. 57906
Email: weisstr@gtlaw.com
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212


**MAYER BROWN LLP**
Mark G. Hanchet (*Pro Hac Vice pending*)
1675 Broadway
New York, NY 10019
Telephone: (212) 506-2500
Facsimile: (212) 262-1910
Email: mhanchet@mayerbrown.com

**ATTORNEYS FOR PLAINTIFF,
PICTET OVERSEAS INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of October, 2013, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on the following parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or via certified mail (return receipt requested) for those parties who are not authorized to receive electronically Notices of Electronic Filing:

Thomas Claus, Helvetia Trust
21485 Lancelot Drive
Brookfield, WI 53045

Mr. Jerry Ostry, AAA Group International Trust
125 S. State Road 7 #104150
Wellington, FL 33414

By: _/s/ Mark A. Salky_
      Mark A. Salky