UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13-81088-CIV-MARRA/MATTHEWMAN

PICTET OVERSEAS INC., et al.,

      Plaintiffs,

vs.

HELVETIA TRUST, et al.

      Defendants.

_____

[DEFENDANTS' PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

      This matter was tried before the Court on January 4 and 5, 2017. Based upon the evidence presented during the bench trial, the argument of counsel, the post-trial submissions by the parties, and otherwise being duly advised in the premises, the Court issues these findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

      By this action, Plaintiffs seek preliminary and permanent injunctive relief prohibiting the Defendants from proceeding with an arbitration Defendants filed against Plaintiffs before the Financial Industry Regulatory Authority, Inc. ("FINRA"). The underlying dispute relates to the fraudulent management of their accounts maintained at an affiliate of the corporate Plaintiff.

      Plaintiffs claim that they are not required under FINRA's Rules to arbitrate the dispute. Plaintiffs raise two primary issues. First, they contend the Defendants were not customers of theirs. Second, they contend that, even if the Defendants were customers of the individual Plaintiffs, the individual Plaintiffs are not associated persons under FINRA's Rules. It goes

without saying that the Court is not deciding the merits of the underlying dispute and makes no findings or conclusions as to the merits of the claims asserted by Defendants.

## I. Findings of Fact

### a. The Plaintiffs

The corporate Plaintiff is Pictet Overseas, Inc., a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a member of FINRA.[1] As such, it is subject to the SEC regulations and FINRA's rules.[2] Pictet Overseas is located in Montreal, Canada.[3] Pictet Overseas is wholly owned by Sopafin (Luxembourg) S.A., which in turn is wholly owned by the eight individual Plaintiffs, who are described in corporate records as "the Pictet Partners."[4]

Pictet Overseas is part of the Pictet Group of companies, consisting of banks and brokerage firms in various parts of the world, all of which are ultimately owned by the eight Pictet Partners.[5] In its marketing materials, the Pictet Group is described as "a partnership of eight owner managers responsible for the entire business of the Group."[6] Pictet states that it "offer[s] only wealth management, asset management, and related assets services."[7] The Pictet Partners promote their "partnership ethos" as a reason for people and institutions to do business with the Pictet Group.[8] The Pictet Partners emphasize in their marketing materials that "our first and final duty is to our clients and our employees."[9]

---

[1]  Testimony of Le, Tr.1 at 15. References to the trial transcript are designated by the volume (Tr.1) and page number (at 15).

[2]  *Id.*
[3]  *Id.* at 13, 21.
[4]  Pl.Ex. 18, Pictet Organization Chart; Testimony of Le, Tr.1 at 23-6, 58.
[5]  Testimony of Salamolard, Tr.1 at 188-9.
[6]  Def.Ex. 47 at 5, 6.
[7]  *Id.* at 5, 10.
[8]  *Id.*
[9]  *Id.* at 34.

The original Pictet entity and the flagship of the Pictet Group is Pictet & Cie, which was founded in 1805.[10]  Pictet Overseas and Pictet & Cie acknowledge that they are affiliates.[11]  At the time of the events giving rise to this case, Pictet & Cie was a partnership governed by the laws of Switzerland owned directly by the eight Pictet Partners, who were the general partners of the partnership.[12]  Pictet & Cie is located in Switzerland and is in the business of providing asset and wealth management services, meaning that it provides investment services for its clients, which includes the custody of assets.[13]  It is regulated as a bank and as a securities dealer by the Swiss counterpart of FINRA known as the Swiss Financial Market Supervisory Authority.[14]

Pictet & Cie maintains the public website that describes the business of the Pictet Group of companies.[15]  The Message from the Partners on the website states:

> We specialise in asset and wealth management. ...
>
> We assume unlimited personal liability. ...  Indeed, we are organised as a true partnership under Swiss law, and, as Partners, we assume unlimited personal responsibility on the Bank's liabilities, which is to say, its entire balance sheet.  This is a significant factor behind our risk-averse attitude.[16]

On another page of the website, Pictet & Cie describes itself as a "bank specialized in asset management" which has "focused solely on managing the wealth of private and institutional investors" since its founding in 1805.[17]  It also states that "Pictet & Cie is a partnership owned by

---

[10]  Testimony of Le, Tr.1 at 26.

[11]  Tr.1 at 27.

[12]  Pl.Ex. 18; Def.Ex. 10, Plaintiffs' Responses and Objections to Defendants' Second Request for Admissions ("Plaintiffs' Second Admissions") at ¶8.  Subsequently, Pictet & Cie was converted to a corporation and is now known as Banque Pictet & Cie, S.A.  Tr.1 at 26.

[13]  Def.Ex. 10, Plaintiffs' Second Admissions at ¶¶7, 9; Tr.1 at 27-8.

[14]  Tr.1 at 28; Def.Ex. 8, Plaintiff's Responses and Objections to Defendants' First Request for Admissions at ¶5; Def.Ex. 10, Plaintiffs' Second Admissions at ¶16-23.

[15]  Tr.1 at 27.

[16]  Def.Ex. 34, Website Pages.

[17]  *Id.*

eight managing partners who stand personally and entirely liable for the Bank's commitments."[18]
It further states that Pictet & Cie is Switzerland's largest private bank with assets under
management and custody totaling $431 billion.[19]

The web site also has a special link at the bottom of the first page that states, "U.S.
Nationals and Residents please click here only for Investments Services, due to local Legal
restrictions applicable to your country."[20]  When one clicks through the link, it states that
accounts of U.S. nationals and residents are opened through Pictet Overseas.[21]

b.      *Pictet Overseas' Regulatory Filings*

The SEC and FINRA require various reporting documents to be filed relative to the
business of broker-dealers, one of which is the Form BD, the Uniform Application for Broker-
Dealer Registration.  The Form BD defines "Control" as "[t]he power, directly or indirectly, to
direct the management or policies of a company, whether through ownership of securities, by
contract, or otherwise."[22]  The Form BD defines a Control Affiliate as "[a] person named … as a
control person or any other individual or organization that directly or indirectly controls, is under
common control with, or is controlled by, the applicant."[23]

On Pictet Overseas' Form BD, Pictet Overseas stated that it and Pictet & Cie are "Control
Affiliates."[24]  It also stated on its Form BD that each of the eight Pictet Partners "controls" Pictet
Overseas and directs the management and policies of Pictet Overseas.[25]

---

[18]   *Id.*
[19]   *Id.*
[20]   Def.Ex. 34.
[21]   Testimony of Claus, Tr.2 at 28.
[22]   *See* https://www.sec.gov/about/forms/formbd.pdf, Explanation of Terms at ¶1 (last visited Jan. 29, 2017).
[23]   *Id.* at ¶3.
[24]   Def.Ex. 10, Plaintiffs' Second Admissions at ¶11.
[25]   Testimony of Le, Tr.1 at 68-9.

FINRA maintains an information source known as the Central Registration Depository ("CRD") system where broker-dealers and brokers provide required information about themselves and the information is made available to the SEC, FINRA, and state securities regulators.[26]  Pictet Overseas reported to the CRD system that the eight Pictet Partners are control persons with respect to Pictet Overseas.[27]  On the CRD system, FINRA reports that the eight Pictet Partners are "Control Persons" of Pictet Overseas.[28]  Pictet Overseas also reported to the CRD that each of the eight Pictet Partners directs the management and policies of Pictet Overseas.[29]

FINRA also maintains an online source of information or disclosure about individual brokers and firms known as BrokerCheck that is available to the public.[30]  On BrokerCheck, FINRA reports that each of the eight Pictet Partners is an "owner [who] directs the management or policies" of Pictet Overseas.[31]  FINRA also reports on BrokerCheck that Pictet Overseas and Pictet & Cie are "indirectly owned and under common control by eight individuals who are also the general partners of Pictet & Cie."[32]

c.     *The Account Opening Process at Pictet & Cie*

As part of its business, Pictet & Cie, has hundreds of independent asset managers that solicit customers to open accounts at Pictet & Cie that will be managed by the asset manager pursuant to a power of attorney.[33]  Pictet & Cie provides the asset managers with all of the account opening applications and other documents necessary for a customer to open an account,

---

[26]  Testimony of Le, Tr.1 at 62; *See also* http://www.finra.org/industry/crd.
[27]  *Id.* at 62, 65.
[28]  Def.Ex. 7, CRD Report at 5-6 of 15.
[29]  Testimony of Le, Tr.1 at 67, 68-9.
[30]  *Id.* at 67; *See also* https://brokercheck.finra.org/.
[31]  Def.Ex. 6, BrokerCheck Report at 7-10.
[32]  *Id.* at 22-23.
[33]  Testimony of Salamolard, Tr. 1 at 238.

the asset manager then fills out the paperwork with the prospective client, and delivers the forms

back to Pictet & Cie.[34]

After an independent manager delivers the papers to Pictet & Cie, the operations team at

Pictet & Cie conducts a due diligence investigation to check the accuracy of the documents and

the information provided within the documents and to satisfy the know your customer

requirements of the anti-money laundering laws.[35]  After the due diligence process is completed,

the application has to be approved by a committee known as a Salon.[36]  The Salon consists of the

Pictet Partners and the heads of risk management, compliance, and credit.[37]  At a meeting of the

Salon, the relationship manager or the due diligence officer will present the list of prospective

clients that have applied to open an account.[38]  The Salon is advised of the name of the

prospective client, their domicile, the amount of the assets that the client plans to keep with

Pictet & Cie, and the background of the client.[39]

In this instance, the Pictet Partners approved the opening of the AAA and Helvetia

accounts at Pictet & Cie to be managed by an independent manager, Brian Callahan, through his

company, Horizon Global Advisors.[40]  It turned out that Callahan, who had already been barred

from the securities industry by FINRA, was operating a Ponzi scheme where he would direct

Pictet & Cie to invest the customers' funds in his own private investment fund, and he then took

---

[34] *Id.* at 208, 223-4.

[35] *Id.* at 208-9, 231-3.

[36] *Id.* at 209.

[37] *Id.*

[38] *Id.*

[39] *Id.* at 210.

[40] *Id.* at 226-9; Testimony of Claus, Tr.2 at 7; Pl.Ex. 2, 3, Applications to Open a Banking Relationship of AAA Group International Trust and Helvetia Trust.

their money and used it for his own purposes and, as a result, all of the Defendants' funds have been lost.[41]

After an account is opened through an independent asset manager, and the customer delivers funds to Pictet & Cie, Pictet & Cie will then issue monthly statements of account and confirmations of each transaction.[42]  Pictet & Cie charges commissions for each transaction.[43]  It also charges a fee to custody the assets that is calculated as a percentage of the supposed value of the assets held in each account at Pictet & Cie.[44]

d.    *The Defendants*

Helvetia Trust was formed by Thomas Claus and his family.[45]  Claus was born and lived for his first 23 years in Germany, and is a U.S. citizen.[46]  After moving to the United States, he worked in the banking industry and developed an interest in trading foreign currencies.[47] Helvetia Trust was formed to pool the inheritances that he, his brother, and his mother received upon the death of his father for the purpose of investing in Swiss francs through Pictet & Cie.[48] Claus is a trustee of Helvetia Trust.[49]

Claus was introduced by a lawyer to Brian Callahan to open an account at Pictet & Cie.[50] Claus reasonably thought, based on the facts that Callahan provided him with all of the account applications paperwork, Callahan submitted the paperwork to Pictet & Cie, Marc Dupraz of Picdtet & Cie told Claus that Callahan was an agent of Pictet & Cie and all communications had

---

[41]  Pl.Ex. 1, Amended Statement of Claim; Testimony of Claus, Tr.2 at 25.
[42]  *Id.* at 240-45; Def.Ex. 48.
[43]  *Id.*
[44]  *Id.* at 241.
[45]  Testimony of Claus, Tr.2 at 6.
[46]   *Id.* at 4-5.
[47]   *Id.* at 6.
[48]   *Id.* at 6-7.
[49]  *Id.* at 18-9.
[50]  *Id.* at 7, 22.

to go through Callahan, and Callahan arranged for everything that was needed to open the account, that Calllahan was an agent of Pictet & Cie.[51] At the time of opening the account at Pictet & Cie., Claus did not know that Callahan had been barred by FINRA from the industry.[52]

Prior to opening the account with Callahan's assistance, Claus reviewed the web site of Pictet & Cie.[53] He also spoke with Marc Dupraz at Pictet & Cie, who Claus thought was going to be his account manager.[54] When Claus reviewed the web site, he took note of the Message from the Partners and relied on, among other things, the statements that the eight Pictet Partners stand personally and entirely liable for the bank's commitments.[55] In addition, he was told by Dupraz that the Helvetia account could not be opened until it was approved by the eight Pictet Partners.[56] As a result, Claus felt "very clearly" that Helvetia was a customer of the eight Pictet Partners.[57] Claus felt that he was receiving the monthly statements of account from the eight Pictet Partners because they were the partners who owned Pictet & Cie.[58]

AAA Group International Trust was formed by Jerry Ostry, who is also a U.S. citizen.[59] Ostry formerly operated a company that provided training materials and courses to pass the various securities exams that are required for licensing by FINRA and the states.[60] He formed AAA for asset protection purposes.[61] Ostry was referred to Callahan to open an account at Pictet & Cie in the same manner as Claus was.[62]

---

[51] *Id.* at 7, 22, 26.
[52] *Id.* at 25.
[53] *Id.* at 9.
[54] *Id.* at 7.
[55] *Id.* at 9, 11.
[56] *Id.* at 7.
[57] *Id.* at 8-13; 15.
[58] *Id.* at 27.
[59] Testimony of Ostry, Tr.2 at 33, 35.
[60] *Id.* at 34.
[61] *Id.* at 35.
[62] *Id.* at 36-7.

Ostry also went to the Pictet web site before opening an account, and saw the same Message from the Partners that is described earlier.[63]  He also viewed a video that was available on the site where the Pictet Partners described how the partners will stand by the customers no matter what happens in any of the Pictet companies.[64]  Ostry said he felt "all eight partners were my friends" and he trusted them implicitly.[65]

When Ostry was viewing the Pictet web site, he clicked on the link for U.S. nationals and was directed to the page that said U.S. nationals had to go through Pictet Overseas to open an account at Pictet & Cie.[66]  He then called Pictet Overseas and spoke with Stephane Zimmerman and was told that he needed a minimum of $5 million to open an account but, if he did not have $5 million, he could go through Callahan to open an account.[67]  Ostry did follow that procedure and went through Callahan to open the account.[68]

Callahan provided Ostry with the account application paperwork, Ostry filled in the information, and sent the paperwork, along with a photo of his driver's license, to Callahan.[69]  In doing so, Ostry relied on the information contained on the Pictet web site.[70]

After the account was opened and Ostry received his first monthly statement, he spoke with Dupraz.[71]  As a result of that conversation, Ostry surmised that Callahan was acting for the Pictet companies because he was gathering assets from investors for investment at Pictet &

---

[63] *Id.* at 37, 40, 42.
[64] *Id.* at 42-3.
[65] *Id.* at 43.
[66] *Id.* at 37-8.
[67] *Id.* at 39.
[68] *Id.* at 40.
[69] *Id.*
[70] *Id.* at 43.
[71] *Id.* at 45.

Cie.[72]  Ostry's impression was that Callahan was being paid by Pictet & Cie because AAA was never invoiced and never paid any fees to Callahan.[73]

e.      *The Claims asserted in the FINRA Arbitration*

AAA and Helvetia, acting *pro se,* prepared and submitted their claim against Pictet Overseas and the Pictet Partners with FINRA.[74]  The FINRA Code of Arbitration Procedure for Customer Disputes does not require that a Statement of Claim meet any pleading requirements, other than it simply "specify[] the relevant facts and remedies requested."  *See* FINRA Rule 12302(a).

Among the allegations asserted by AAA and Helvetia are: (a) Pictet & Cie sent out fraudulent statements to each of the Defendants;[75] (b) Callahan solicited the opening of the accounts;[76] (c) Callahan was located in New York;[77] (d) Callahan was barred from the securities industry because of embezzlement and forgery;[78] (e) on a video downloaded from Pictet's website, the speaker states that the eight partners "control all Pictet entities from top to bottom;[79] (f) the eight Pictet Partners aided and abetted the fraud committed by Callahan;[80] (g) the Pictet Partners did business with Callahan knowing he had been fired from his prior firm and was barred from the securities industry;[81] (h) Pictet & Cie's eight Partners control Pictet Overseas;[82] (i) Pictet "essentially operat[ed] from the Continental USA with a disbarred FINRA member [*i.e.* Callahan], ... dealing with a FINRA convicted forger, embezzler and general overall crook, and

---

[72]  *Id.* at 46.
[73]  *Id.* at 46-7.
[74]  Amended Statement of Claim, Pl.Ex. 1 at 2.
[75]  *Id.* at 6 of 16, ¶ 14.
[76]  *Id.* at 5 of 16, ¶ 2.
[77]  *Id.*
[78]  *Id.* at 10 of 16.
[79]  *Id.* at ¶ 3.
[80]  *Id.* at 6 of 16, ¶ 15.
[81]  *Id.* at 7 of 16, ¶1.
[82]  *Id.* at 8 of 16.

engaging that person as a partner, and allowing the crook to be hired and deal with him;"[83] (j) Pictet sent statements showing the funds were still at Pictet when, in fact, the money had been sent out of the accounts to Callahan;[84] and (k) once the money was in his hands, Callahan stole the money.[85]  Thus, the "dispute" is broadly worded and concerns actions of Pictet Overseas and the Pictet Partners, independent of Callahan, in failing to supervise the activities of the Pictet Partners, including the approval of and partnering with Callahan, the sending of fraudulent statements of account to the United States, and allowing the funds to leave the accounts at Pictet & Cie.

## II.  Conclusions of Law

### a.   Introduction

Plaintiffs seek to enjoin permanently the FINRA arbitration initiated by the Defendants. Although the Court has previously issued a preliminary injunction in this case, "[t]he fact that preliminary relief is obtained does not mean that permanent relief also must be forthcoming."  *In re Dixie Braodcasting, Inc.*, 871 F.2d 1023, 1029 (11th Cir. 1989) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 394-95 (1981)); *McArthur v. Firestone*, 817 F.2d 1548 (11th Cir.1987)(district court's denial of temporary restraining order did not constitute decision of merits of First Amendment claim).

In *KH Outdoor, LLC v. City of Titusville,* 458 F.3d 1261, 1268 (11th Cir. 2006), the Court set forth the standards for granting preliminary and permanent injunctive relief, as follows:

> A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and

---

[83] *Id.* at 9 of 16.
[84] *Id.*
[85] *Id.* at 11-12 of 16.

(4) if issued, the injunction would not be adverse to the public interest.

The Eleventh Circuit held that "[f]or a permanent injunction, the standard is essentially the same, except that the movant must establish actual success on the merits, as opposed to a likelihood of success." *HK Outdoor*, 458 F.3d at 1268.

The "party seeking a permanent injunction has the burden of proof." *Montgomery v. Florida First Fin. Group, Inc.,* 2008 WL 3540374 at *12 (M.D.Fla. 2008). "With respect to a preliminary or permanent injunction, Plaintiffs have the burden of proving the basis for a preliminary or permanent injunction." *In re National Rural Utilities Cooperative Finance Corp.,* 467 B.R. 59, 67 (D.Del. 2011) *citing Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 90 (3d Cir.1992). "In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (*i.e.* met its burden of proof.)." *CIBA–GEIGY Corp. v. Bolar Pharmaceutical Co., Inc.,* 747 F.2d 844, 850 (3d Cir.1984). Here, as in any trial on the merits, the burden of proof requires that Plaintiffs prove every essential element of their claim by a preponderance of the evidence. *See* Instruction No. 3.7.1, Pattern Jury Instructions, Civil Cases, Eleventh Circuit (2013 Version).

b.    *FINRA's Arbitration Forum*

FINRA is a quasi-governmental agency established under Section 15A of the Securities Exchange Act of 1934 (the "1934 Act"). 15 U.S.C. § 78o-3; SEC Release No. 34-56145 (Jul. 26, 2007). FINRA is charged by Congress with investor protection through the exercise of comprehensive oversight of the securities industry. *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 652 (2d Cir. 2011); *Starks v. SEC*, 648 F.3d 945, 948 (9th Cir. 2011). FINRA achieves its investor protection mission by, among other things, administering "the largest [arbitration] forum specifically designed to resolve securities-related disputes by and among

investors, securities firms, and individual brokers." *See* FINRA: What We Do*, available at* http://www.finra.org/about/what-we-do (last visited Jan. 29, 2017). "FINRA's arbitration forum promotes investor protection and market integrity and undergirds FINRA's rules requiring firms to arbitrate with customers and associated persons at their request." FINRA Regulatory Notice No. 16-25 at 2 (Jul. 2017) *available at* http://www.finra.org/sites/default/files/ notice_other_file_ref/Regulatory-Notice-16-25.pdf (last visited Jan. 30, 2017).

Upon joining FINRA, a member organization agrees to comply with FINRA's rules. *See* FINRA By-Laws, Art. 4 § 1, *available at* http://finra.complinet.com/en/display/display_main. Html?rbid=2403&element_id=4609 (last visited Jan. 30, 2017). As a FINRA member, Pictet Overseas is bound to adhere to FINRA's rules and regulations, including its arbitration Code and the relevant provisions therein. *UBS Fin. Servs.*, 648 F.3d at 948.

Under the Federal Arbitration Act, "any doubts concerning the scope of arbitration issues should be resolved in favor of arbitration." *Moses H. Cohen Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). "[U]nless the Court can say with positive assurance that the arbitration provisions at issue are not susceptible of an interpretation in favor of arbitration, the Court must find in favor of arbitration." *First Montauk Securities Corp. v. Four Mile Ranch Dev. Co.,* 65 F.Supp.2d 1371, 1377 (S.D. Fla. 1999), *citing Kidd v. Equitable Life Assur. Soc.,* 32 F.3d 516, 519 (11th Cir.1994), *cert. denied,* 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 606 (1997); *see also Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 353 (4th Cir. 2012)("an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute"); *SII Inv., Inc. v. Jenks*, 370 F.Supp.2d 1213, 1217 (M.D.Fla. 2005)(same); *Bank of the Commonwealth v. Hudspeth*, 714 S.E.2d 566, 570 (Va. 2011)(same).

c.      *FINRA's Arbitration Code*

FINRA Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes

(the "Code") requires parties to arbitrate a dispute under the Code in certain circumstances.

> Parties must arbitrate a dispute under the Code if [1] … [r]equested
> by the customer; [2] the dispute is between a customer and a
> member or associated person of a member; and [3] the dispute
> arises in connection with the business activities of the member or
> the associated person."

Thus, Pictet Overseas and the Pictet Partners must arbitrate the underlying dispute if the

Defendants are "customers" of the Pictet Partners and the dispute arises in connection with the

*business activities* of either Pictet Overseas or the Pictet Partners.

d.      *The Defendants were customers under the FINRA Code*

FINRA Rule 12100(i) of the Code broadly defines a customer for the purposes of the

Code as anyone who is not a broker or dealer.  The Rule does not specify that any additional

criteria must be met to qualify as a customer.  *First Montauk Sec. Corp.*, 65 F.Supp.2d at 1381

(the Rule defining customer "contains no limitations other than exclusion of brokers and dealers

from invoking rules relating to customers").

In determining whether the Defendants were customers, the two controlling Eleventh

Circuit decisions in *Multi-Financial Securities Corp. v. King*, 386 F.3d 1364 (11th Cir 2004) and

*MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340 (11th Cir. 2004), are binding on this Court.  In

*King,* the investor purchased a product recommended by the associated person unrelated to the

brokerage firm.  It is a practice known as "selling away."  The FINRA member, IFG, submitted

proof that it did not approve the sale, did not have any record of the sale, the investor did not

have an account or any contract with IFG, and IFG did not receive or disburse any funds in

connection with the sale.  *Id.* at 1366.  The associated person also submitted sworn testimony

that "I did not provide [King] with a business card or correspond with [King] on letterhead referring to IFG....  I did not provide [King] with any documents referring to IFG... or indicating that IFG ... was involved with [her investment]." *Id.*  Like the Defendants here, the essence of the investors' claim was that IFG failed to supervise the associated person. *Id.*  IFG argued that King was not its customer under the Code.  The Eleventh Circuit disagreed and held King was a customer under the Code. *Id.* at 1368.

In reaching that conclusion, the Eleventh Circuit said that "arbitration is a matter of contract" and the NASD Code of Arbitration Procedure, now the FINRA Code, "serves as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants."[86] *Id.* at 1367.  The Court held that:

> To determine whether IFG's written agreement to arbitrate governs this dispute with King, the Court must interpret the Code as it would a contract under the applicable state law, giving effect (as it does when interpreting any contract) to the parties' intent expressed by the ordinary meaning of the language they used.  But, unlike other contracts, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."

*Id.* (internal citations omitted).  The Court also noted whether arbitration is required that under the Code is a two-prong analysis: (1) whether the claim involves a dispute between an associated person and a customer of the associated person, and (2) whether the dispute arises in connection with the business activities of the associated person.  *Id.*

In analyzing whether King was a customer, the Court expressed very clear mandates. First, it rejected the argument that King had to be a customer of IFG, holding that:

---

[86]   The National Association of Securities Dealers ("NASD") became known as FINRA in 2007 upon  the consolidation of the member firm regulatory functions of NASD and NYSE Regulation, Inc. ("NYSE Regulation"), a wholly-owned subsidiary of New York Stock Exchange LLC ("NYSE LLC").  *See* News Release, NASD and NYSE Member Regulation Combine to Form the Financial Industry Regulatory Authority - FINRA (Jul. 30, 2007), *available at* http://www.finra.org/newsroom/2007/nasd-and-nyse-member-regulation-combine-form-financial-industry-regulatory-authority (last visited Feb. 1, 2017).

> The NASD generally defines the term "customer" as anyone who is not a broker or a dealer. NASD Rule 0120(g). Although it concedes that King was Micciche's "customer," as that term is used in the Code, IFG argues that King was not *its* customer. Rules 10101(c) and 10301(a), however, unambiguously provide that the King is a customer as long as she is not a broker or dealer; nothing in the Code directs otherwise or requires more. Enforcing the limitation IFG seeks would be tantamount to reading language into the Code that is conspicuously absent. Other inapplicable NASD rules do make a distinction between customers generally and customers of the member. The NASD rule pertaining to disclosure of financial condition to customers, for example, defines "customer" as "any person who, in the regular course of such member's business, has cash or securities in the possession of such member." NASD Rule 2270(b). The NASD rule regarding margin requirements similarly provides that "customer" means any person for whom securities are purchased or sold or to whom securities are purchased or sold...." NASD Rule 2520(a)(3). Rules 2270(b) and 2520(a)(3) show that the NASD could limit the term "customer" specifically to those with whom the member has a direct relationship. Its clear and unambiguous choice to leave the term as defined generally immediately leads to the conclusion that King satisfies the "customer" requirement because she is not a broker or a dealer, even though she may not have been a direct customer of IFG.

*Id.* at 1368 (emphasis in original).[87] Thus, because the Code generally defines the term "customer" as anyone who is not a broker or dealer, and "nothing in the Code directs otherwise or requires more," it is improper "to read[] language into the Code that is conspicuously absent." *Id.*

Second, the Court rejected the invitation to consider extrinsic evidence as to the purported intent of the NASD, saying the Code is "clear and unambiguous." *Id.*, f.n. 3.

Third, the Court rejected the argument that the definition of customer must conform to the "reasonable expectations of NASD members," holding that the reasoning of the Courts that employ that notion "is not persuasive, however, because they read a limitation into the Code that

---

[87]   All of the FINRA Rules were renumbered in 2007. FINRA Rule 0120(g) was the definition of "Customer" and is now Rule 12100(i). FINRA Rules 10101(c) and 10301(a) set forth the matters that require arbitration and are now Rule 12200 as it relates to customers.

is absent from its language." *Id.* at 1369.  The Court also pointed out that the NASD has been on notice since 2001 that some courts have interpreted the term "customer" broadly, that the NASD could have amended the definition to eliminate the so-called "injustice" of requiring arbitration even though it would violate the reasonable expectation of members, but the NASD has not amended the definition, thus leading the Court to conclude a broad interpretation of customer– *i.e.,* anyone who is not a broker or dealer–"is consistent with the NASD members' reasonable expectations." *Id.* at 1369-70.

Fourth, the Court rejected the notion that the customer must have a "direct relationship" with the firm.  *Id.* at 1368.  *See also Vestax Secs. Corp. v. McWood*, 280 F.3d 1078, 1082 (6th Cir. 2002) (Court rejected the argument that the Code requires the defendant-investors be direct customers of the NASD member firm in order to compel arbitration against the member); *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 60 (2nd Cir. 2001)(Court rejected contention that a customer was required to have a direct relationship with the member firm); *WMA Sec., Inc. v. Ruppert*, 80 F.Supp.2d 786, 789 (S.D. Ohio 1999) ("The facts that Defendant Rupert never had an account with Plaintiff and that the [securities] in which both Defendants invested were not approved products of Plaintiff are irrelevant").

Following *King*, the Eleventh Circuit decided *Bornstein,* which is very similar to the present case.  In *Bornstein*, the associated person, Keller, "had affiliations with several businesses," including MONY Securities Corp.  390 F.3d at 1341.  According to the District Court, Keller "worked as an independent contractor for Plaintiff MONY ... and various other investment firms." *MONY Sec. Corp. v. Bornstein,* 250 F.Supp.2d 1352, 1353 (M.D.Fla. 2003). Keller recommended that Bornsteins purchase viatical contracts through a company "unrelated to MONY." *Id.* at 1341.  MONY argued it did not have a duty to supervise Keller.  *Id.* at 1344.

17

MONY also argued that its only connection to the Bornsteins was through an intermediary (*i.e.,* Keller), and that its duty to supervise Keller was not part of its business.  *Id.*

*Bornstein* re-affirmed the mandates of *King*.  *Id.* at 1344.  It held that "supervision of associated persons arises in connection with the member's business" and therefore the dispute arose in connection with the business of the member.  *Id.* at 1344-5.  *See also First Montauk Sec. Corp.*, 65 F.Supp.2d at 1379 ("A dispute that arises from a firm's lack of supervision over its brokers 'arises in connection with its business.'").  Bornstein also re-affirmed the rejection of the "reasonable expectation of the members" argument, saying "*King* answered the tantalizing question ... and we subscribe to *King's* answer."  *Id.* at 1346.  Finally, *Borstein* re-affirmed the rejection of the argument that language may be read into the term "customer."  *Id.* at 1345.

Adding further support to the *King* and *Bornstein* holdings is that in 2011 FINRA proposed amendments to the Rule containing the definitions, the SEC approved the amendments with an effective date of February 21, 2012, and the amendments left intact the broad definition of "customer" as anyone who is not a broker or dealer.  Securities Exchange Act Release No. 65599 (October 20, 2011) 76 Fed.Reg. 66,344 (Oct. 26, 2011); FINRA Regulatory Notice 12-04.[88]  In the Regulatory Notice announcing the SEC's approval, FINRA specifically commented on the fact that the definitions of customer and several others were not amended, stating that "[t]hese defined terms are achieving their intended purpose and are appropriate in their application to the consolidated FINRA rules."  FINRA Regulatory Notice 12-04 at 2.  Therefore, the *King* and *Bornstein* holdings are even more forceful today, especially the holdings that a broad interpretation of customer, meaning anyone who is not a broker or dealer, is indeed consistent with the FINRA members' reasonable expectations.  Given FINRA's "clear and

---

[88]  The Notice is available at http://www.finra.org/sites/default/files/NoticeDocument/ p125406.pdf (last visited Sept. 23, 2015).

unambiguous choice to leave the term "customer" as defined generally immediately leads to the conclusion that [Defendants] satisf[y] the "customer" requirement because [each] is not a broker or a dealer."  *King*, 386 F.3d at 1368.

But, there are additional reasons to conclude that Defendants were customers of the eight Pictet Partners.  The Pictet Partners were the sole general partners of Pictet & Cie, they were "responsible for the entire business of the Group," they informed the customers that "our first and final duty is to our clients and our employees," they informed the customers that as the managing partners they "stand personally and entirely liable for" Pictet & Cie's commitments, they informed the SEC and FINRA that each "controls" both Pictet Overseas and Pictet & Cie, they informed the SEC and FINRA that each of Pictet Overseas and Pictet & Cie are "under the[ir] common control," they informed the SEC and FINRA that each "directs the management or policies" of Pictet Overseas, they promoted the "partnership ethos" in marketing materials and on the Pictet & Cie web site to induce the Defendants and others to open accounts at Pictet & Cie, they specifically approved the opening of the Defendants' accounts and those accounts would not have been opened but for the specific approval of the Pictet Partners, they approved the business practice where Pictet & Cie had hundreds of independent asset managers, including Brian Callahan, soliciting funds to be managed at Pictet & Cie, they knew that by approving the Defendants' accounts they would earn fees for custody and commissions for transactions initiated by Callahan pursuant to his "wealth management" of the accounts, they knew that Callahan had been barred from the securities industry when they approved the opening of the Defendants' accounts, they issued fraudulent statements of account to the Defendants showing a made-up value for the assets supposedly in the account that actually were not in the account at all, they issued confirmations of the transactions in the accounts to Defendants, and they charged

commissions for transactions and custodial fees for the assets in the Defendants' accounts. It is beyond argument that the Defendants purchased services and securities through a securities account with the Pictet Partners and, therefore, were customers of the Pictet Partners.

Plaintiffs argue that Pictet & Cie is a business entity and having an account at Pictet & Cie is not the same as having an account with the Pictet Partners. This misses the mark for two reasons. First, the Plaintiffs did not submit any evidence of the partnership laws of Switzerland. The Court takes the Pictet Partners at their word, as did the Defendants, when the Partners say they are the general partners of Pictet & Cie, a "true partnership under Swiss law," they "assume unlimited personal responsibility" for the Bank's liabilities, they "stand personally and entirely liable" for the Bank's affairs, and they control and direct the management and policies of Pictet Overseas and Pictet & Cie. Second, the issue is not whether Defendants had accounts directly with the Pictet Partners. Clearly, they had accounts with Pictet & Cie, a true partnership that was owned and controlled by the Pictet Partners. But, more importantly, the Defendants purchased services and securities through the Pictet Partners. *See Beer v. Nutt*, 2007 WL 13100 * 4 (S.D.N.Y. 2007) ("[I]nformal business relationships, even tenuous connections among the customer, associated person, and NASD member are sufficient to compel arbitration.").

*Walnut St. Sec., Inc. v. Lisk*, 497 F.Supp.2d 714 (M.D.N.C. 2007) is illustrative. In *Lisk*, an associated person set up a separate corporation to sell certain unregistered securities. The corporation was owned by the associated person and her daughter. *Id.* at 719. The investors did not purchase the securities from the associated person but instead "purchased the securities from the daughter or persons hired by the corporation." *Id.* A number of the investors had never met the associated person and the sales were not made directly by the associated person. *Id.* The court concluded that, even though "the sale was not made directly by an associate[d person] of the

ember firm, but by a non-associate[d] person, albeit one who had some connection with the associate[d] person], the investors were customers of the associated person who used the corporation she established to make the sales. *Id*. at 719, 726.

Given the evidence and the case law, the Court cannot can say with positive assurance that the definition of customer in the FINRA Code is not susceptible of an interpretation in favor of the Defendants being customers.

e.     *The Dispute arises out of the business activities of both Pictet Overseas and the Pictet Partners.*

It is not necessary that the dispute arise out of the business activities of the member as long as the dispute arises out of the business activities of the associated member. *See, e.g.*, *Vestax Secs.*, 280 F.3d at 1083 ("arbitration of the dispute can be compelled even if the investors never became Vestax 'customers' and even if their claims did not arise in connection with the business of Vestex, as long as the investors were customers of associated persons Davis and Dunn and as long as the claims arose in connection with the activities of Davis and Dunn"); *WMA Sec., Inc.*, 80 F.Supp.2d at 789 ("The full clause requires that the claim arise *either* in connection with Plaintiff's business *or* in connection with the activities of persons associated with Plaintiff") (emphasis in original).

The FINRA dispute submitted by the Defendants arises out of the asset management, wealth management, and investment services provided by Pictet & Cie, which is wholly owned by the Pictet Partners, to AAA and Helvetia.  The eight Pictet Partners advertised that Pictet & Cie is a partnership owned by the eight partners who will be personally liable for all acts and omissions of Pictet & Cie.  The court concludes that the dispute arises out of the business activities of the eight Pictet Partners.

In addition, a member's supervision of the activities of its associated persons in order to comply with applicable securities laws and the rules of FINRA arises in connection with the member's business.  *See, e.g., First Montauk*, 65 F.Supp.2d at 1379-80.  Further, Pictet Overseas recommended that AAA to open an account through Callahan at Pictet & Cie.  Therefore, the Court also concludes that the dispute arises out of the business of Pictet Overseas as well.

f.   *The Pictet Partners are associated persons of Pictet Overseas*

FINRA Rule 12100(r) of the Code defines an associated person for the purposes of the Code as:

> (1)  A natural person who is registered or has applied of registration under the Rules of FINRA; or
>
> (2)  A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA.

Thus, an associated person is any natural person who is "engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member."

The Pictet Partners are associated persons under this definition.  They are engaged in the securities business as the owners of the Pictet Group and they control Pictet Overseas and Pictet & Cie.  Indeed, the Plaintiffs admit that Pictet Overseas is "owned and under common control of the eight individuals who are also the general partners of Pictet & Cie, a private Swiss bank" that is regulated as a securities dealer in Switzerland.  Pictet Overseas admits that each of the eight individual Plaintiffs "direct[s] the management or policies of the firm." Insofar as FINRA and the SEC are concerned, the Pictet Partners are control persons with respect to Pictet Overseas.

*See JHS Capital Holdings v. Deel*, 2010 WL 5296928 at * 3 (E.D. Mich. 2010) (finding that indirect owner was an associated person under the rule).

The Plaintiffs urge that an associated person is only someone who is involved in the day-to-day business of the member firm or someone who is able to set policy for the member.  This argument ignores the plain wording of the Rule and would require the Court to infuse the Rule with the words "day-to-day management."  *King* and *Bornstein*, however, teach that it is improper to read language into the Code that is conspicuously absent.  *King*, 386 F.3d at 1368; *Bornstein*, 390 F.3d at 1345.  In addition, because the evidence showed that the Pictet Partners are able to set policy at Pictet Overseas, they are associated persons under Plaintiffs' theory as well.

### III.  Conclusion

Two principles guide the Court's analysis.  First, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone,* 460 U.S. at 24-25.  Second, "unless the Court can say with positive assurance that the arbitration provisions at issue are not susceptible of an interpretation in favor of arbitration, the Court must find in favor of arbitration." *First Montauk,* 65 F.Supp.2d at 1377.  Based on the evidence and applicable case law, the Court concludes that under the FINRA Code the Defendants are customers, the Pictet Partners are associated persons, and the dispute arises out of the business activities of both Pictet Overseas and Pictet and Cie.

It is hereby ORDERED AND ADJUDGED as follows:

1)      Plaintiffs' request for permanent injunction is denied, the preliminary injunction is vacated, and Plaintiffs shall take nothing from Defendants.

2)      Judgment shall be separately entered for Defendants.

3)      The Clerk shall close this case and all pending motions are denied as moot.

DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County, Florida,

this ____ day of February, 2017.


_____

UNITED STATES DISTRICT JUDGE