## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 13-81088-CIV-MARRA/MATTHEWMAN

| | |
|---|---|
| PICTET OVERSEAS INC., PHILIPPE | ) |
| BERTHERAT, REMY ANTOINE BEST, | ) |
| RENAUD FERNAND DE PLANTA, | ) |
| JACQUES JOSEPH DE SAUSSURE, | ) |
| BERTRAND FRANCOIS LAMBERT | ) |
| DEMOLE, JEAN-FRANCOIS DEMOLE, | ) |
| MARC PHILIPPE PICTET, and | ) |
| NICOLAS LUCIEN PICTET, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| HELVETIA TRUST and AAA | ) |
| GROUP INTERNATIONAL TRUST, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs[1] initiated this action seeking declaratory and injunctive relief to enjoin an

arbitration proceeding brought before the Financial Industry Regulatory Authority ("FINRA") by

Defendants Helvetia Trust and AAA Group International Trust ("Defendants" or "Trusts").  The

issue before the Court is whether FINRA Rule 12200, which requires the FINRA arbitration of

disputes between "customers" and FINRA members or "associated persons" of FINRA members

that arise in connection with the business activities of the member or associated person, compels

Plaintiffs to arbitrate with Defendants.  A bench trial was held on January 4-5, 2017, and the

---

[1]     Plaintiffs include Pictet Overseas, Inc. ("POI"), Philippe Bertherat, Remy Antoine Best, Renaud Fernand De Planta, Jacques Joseph De Saussure, Bertrand Francois Lambert Demole, Jean-Francois Demole, Marc Philippe Pictet and Nicolas Lucien Pictet (collectively, the "Individual Plaintiffs," and together with POI, "Plaintiffs").

issues in this action are now ripe for the Court's determination.

The evidence at trial established that: (1) Defendants were not "customers" of POI or of the Individual Plaintiffs, but rather were customers of a Swiss bank, Pictet & Cie (now known as "Banque Pictet") with which they opened custodial bank accounts; (2) the Individual Plaintiffs were not involved in POI's business and are not "associated persons" of POI; and (3) the dispute does not relate to the business activities of a FINRA member, but rather relates solely to the custodial Swiss bank accounts in Geneva that Defendants opened with Banque Pictet, a non-FINRA member.  Plaintiffs are entitled to a declaratory judgment that Defendants are not customers of POI or any of its associated persons, that they are not customers of the Individual Plaintiffs under FINRA Rule 12200 and that their claims are not arbitrable.  Defendants also should be permanently enjoined from further proceeding with the FINRA Arbitration.

## PROCEDURAL HISTORY

In or around[2] July 2013, Defendants commenced a FINRA arbitration proceeding (the "Arbitration") against POI, the Individual Plaintiffs and a number of POI's corporate affiliates by filing a statement of claim with FINRA.  In the Arbitration, Defendants sought $1.8 million in actual damages, treble damages and $100 million in punitive damages.  (Pl. Ex. 1, FINRA Statement of Claim.)  The thrust of Defendants' Arbitration claim was that Plaintiffs (and various POI affiliates) were responsible for losses Defendants incurred when their independent asset manager, Brian Callahan, misappropriated funds held in Defendants' custodial bank accounts at Banque Pictet.  *Id.*  Banque Pictet is a Swiss bank headquartered in Geneva, Switzerland; it is not a FINRA member and it is not a party to this action.  POI is a broker-dealer and a FINRA member located in Montreal, Canada.  Defendants admit that they "did not have

---

[2]     Defendants' Statement of Claim is undated.

customer accounts with [POI]" and "did not buy or sell securities or have any contractual relationship with [POI]." (ECF 171, Joint Pretrial Stipulation at 5(d) and (e).)

On October 23, 2013, POI initiated this action, alleging that it has never had any agreement to arbitrate with Defendants, does not consent to arbitrate and is not otherwise required to arbitrate with Defendants under FINRA rules. (ECF No. 1.) The complaint sought two forms of relief: (1) an injunction permanently enjoining the Arbitration; and (2) a declaration that Defendants are not customers of POI or any of its associated persons and Defendants' claims are not arbitrable. (*Id.*) On November 27, 2013, Plaintiffs amended the complaint to add the Individual Plaintiffs (ECF No. 36.) and on December 16, 2013, Plaintiffs amended the complaint for a second time, adding detail regarding the citizenship of each of the Individual Plaintiffs and of the Defendants' trustees. (ECF No. 43.)

At the time Plaintiffs commenced this action, they also moved for a preliminary and permanent injunction. (ECF No. 3.) Defendants opposed the motion. (ECF No. 11.) In their opposition, Defendants outlined their theory of FINRA jurisdiction. They contend that when the Trusts opened custodial bank accounts with Banque Pictet in Geneva, they became customers not just of the Swiss bank but also, for the purposes of FINRA Rules, customers of the Individual Plaintiffs. The Individual Plaintiffs each had ownership interests in Banque Pictet and were general partners of the bank, which at the time was structured as a limited partnership under Swiss law. Defendants next contend that, since the Individual Plaintiffs also each have a 12.5% ownership interest in Sopafin (Luxembourg) S.A., a holding company that wholly owns POI, these Individual Plaintiffs are "associated persons" of FINRA member POI. Finally, Defendants posit that the dispute is arbitrable because it arises from the "business activities" of the Individual Plaintiffs in Switzerland (through Banque Pictet).

Following a January 2, 2014 evidentiary hearing on Plaintiffs' motion for a preliminary and permanent injunction, Magistrate Judge Matthewman issued a Report and Recommendation (the "Matthewman Report"), recommending that a preliminary and permanent injunction should issue.  (ECF No. 44.)  According to the Matthewman Report, Defendants were not customers of POI or of the Individual Plaintiffs (*id.* at 11-15) and Plaintiffs had no reasonable expectation that they might face FINRA arbitration with the Trusts.  (*Id.* at 15.)  Magistrate Judge Matthewman concluded that the Court should issue a preliminary injunction and a permanent injunction, because "additional discovery and/or a second evidentiary hearing would not change the fact that Defendants were never customers of Plaintiff [POI], the FINRA member, or the [I]ndividual Plaintiffs . . . [and] Defendants have not proffered any anticipated discovery that could conceivably alter the result in this case."  (*Id.* at 21.)

By order dated February 7, 2014, the Court adopted the Matthewman Report's findings of fact and conclusions of law and its recommendation that a preliminary injunction be issued. (ECF No. 49.) In so doing, the Court noted Defendants' request to seek discovery and declined to issue a permanent injunction until Defendants were afforded the opportunity to seek that discovery.  (*Id.*)  Discovery in this action proceeded for over a year, after which both parties filed dispositive motions.  (ECF Nos. 135, 136.)  The Court denied both motions and set this case for a bench trial.  (ECF No. 152.)  Pursuant to the Court's Order granting a preliminary injunction (ECF No. 49), the Arbitration has been stayed while this action is pending.

## I.   <u>FINDINGS OF FACT</u>

At trial, Plaintiffs presented three witnesses: (1) Déodat Lê, Chief Compliance Officer of POI (*see* TR1: 9)[3], (2) Antoine Salamolard, head of legal for asset servicing, trading and

---

[3]   Citations to "TR1" refer to the first day (January 4, 2017) trial transcript, with cited page following the colon.  Citations to "TR2" refer to the second day (January 5, 2017) trial transcript.

alternative investments of Banque Pictet (*see* TR1: 183-84) and (3) Marc Menchel, a former

General Counsel of FINRA, who testified as an expert witness (*see* TR1: 99, 106). Defendants

presented two witnesses: (1) Thomas Claus, trustee for Defendant Helvetia Trust (*see* TR2: 4, 6)

and (2) Jerry Ostry, trustee for Defendant AAA Group International Trust (*see* TR2: 33).  The

Court also admitted a total of seventeen Exhibits into evidence. (*See* ECF No. 200.)  Through

these witnesses and admitted documentary evidence, the following facts were adduced.

        A.    **The Parties**

     POI is a Canadian broker-dealer and a FINRA member.  (TR1: 12; *see also* Joint Pretrial

Stipulation at 5(a).)  It is headquartered in Montreal, Quebec, where its only office is located and

where all of its 35 employees are based. (TR1: 17; *see also*, Joint Pretrial Stipulation at 5(c).)

POI is an execution broker, specializing in the settlement of transactions involving equities,

bonds, options and foreign exchange for institutional investors. (TR1: 13.) It does not hold client

funds or securities and, in fact, POI is not licensed to maintain custody accounts by virtue of its

FINRA membership agreement. (TR1: 14, 15.)  POI first learned of the Arbitration when it

received by mail a copy of the Statement of Claim in September, 2013. POI immediately

conducted a search of its records and confirmed that neither the Trusts nor their respective

trustees had ever held accounts with POI. (TR1: 39-40.)  And, in fact, Defendants concede that

they "did not have customer accounts with [POI]" and "did not buy or sell securities or have any

contractual relationship with [POI]." (ECF 171, Joint Pretrial Stipulation at 5(d) and (e).)

     POI is a wholly owned subsidiary of Sopafin (Luxembourg) S.A. ("Sopafin"), which in

turn is owned by the eight Individual Plaintiffs. (TR1: 22-23*; see also*, Pl. Ex. 18.)

     The Individual Plaintiffs, each of whom is domiciled in Switzerland, are the former

general partners of nonparty Banque Pictet.   Banque Pictet is a large, private Swiss bank

headquartered in Geneva. (TR1: 187.)  Founded in 1805, Banque Pictet has approximately

40,000 customers and 2,500 employees in branches located in various cities in Switzerland with approximately 250 billion Swiss Francs (roughly equivalent to $250 billion) in holdings. (*Id.*) It competes with some of the most prominent banks in the world, including UBS and Credit Suisse. (*Id.*) Banque Pictet is not regulated by FINRA. (TR1: 195.) Instead, it is regulated by the Swiss Financial Market Supervisory Authority, known as "FINMA" which is a regulatory body in Switzerland that is unrelated to FINRA. (TR1: 192-95.) Unlike POI, Banque Pictet offers custodial services to customers. (TR1: 195.) These services involve holding assets, such as cash or securities, on behalf of bank customers in Switzerland. (*Id.*) Prior to 2014, Banque Pictet was organized as a limited partnership under Swiss law. (TR1: 190-91.) In 2014, Banque Pictet changed its legal structure to Société Anonyme, or S.A, which is akin to a corporate structure under U.S. law. (TR1: 190.)

Defendants are offshore trusts governed by the laws of St. Lucia, West Indies. (ECF No. 171, Joint Pretrial Stipulation at 5(h) and (k).)

### B.    Defendants' Relationship with Brian Callahan and Opening of Custodial Accounts with Banque Pictet

In 2008 and 2010, Defendants opened custodial accounts with Banque Pictet in Geneva. (ECF 171, Joint Pretrial Stipulation at 5(f).) Defendants did so through the third-party asset manager they had selected, Brian Callahan. (TR2: 7; TR2: 39-40.) Brian Callahan was never an employee, registered representative or agent of either Banque Pictet (TR1: 217) or of POI (TR1: 46). In fact, neither Mr. Callahan, nor his company Horizon Global Advisors Ltd. (and/or Horizon Global Advisors, LLC), had any relationship with Banque Pictet or with POI. (TR1: 46, 218.) Mr. Callahan was engaged directly by Defendants to invest their funds held in their custodial bank accounts at Banque Pictet in Geneva. (*See* TR1: 222-23).

The account-opening agreements for Defendants' custodial accounts with Banque Pictet

contained forum selection and choice-of-law provisions, which state as follows:

> The relationship between the Bank and the Client shall be governed exclusively by Swiss law.
>
> Any dispute concerning the relationship between the Bank and the Client shall be subject to the exclusive jurisdiction of the Courts of Geneva. An appeal shall lie to the Federal Supreme Court of Switzerland is reserved.
>
> The place of execution, the place of prosecution and the place of jurisdiction shall be Geneva. The Bank shall nonetheless be entitled to initiate proceedings in the jurisdiction of domicile of the Client or any other competent jurisdiction.

(Pl. Exs. 2 and 3, Articles 38 and 39.)  These are standard provisions used in all Banque Pictet account-opening agreements. (TR1: 215-16.)

### C.    POI and the Individual Plaintiffs

At all relevant times each Individual Plaintiff held a 12.5% ownership interest in POI's parent holding company, Sopafin (*see* Pl. Ex. 18).  None of the Individual Plaintiffs had any involvement in the operations of POI, and none is considered by POI to be its associated person. (TR1: 32.) As a FINRA regulated broker-dealer, POI is charged with supervising those "associated persons" that conduct its day-to-day business. (TR1: 30.)  POI is required to maintain a list of its associated persons as part of its compliance manual. (*Id.*)  Because the Individual Plaintiffs are not engaged in POI's daily business and have no involvement in its broker activities, POI does not supervise the Individual Plaintiffs and does not list them on the compliance manual as associated persons.  (TR1: 32.)  Approximately every three years, FINRA conducts intensive, on-site audits of POI during which FINRA representatives review, among other things, the broker dealer's compliance manual and its list of associated persons. (TR1: 34-36.)  POI has never been notified by FINRA that its associated person list was in any way inadequate. (TR1: 36.)

7

### D.   FINRA Rules 12200 and 12100(a)

Under FINRA Rule 12200, arbitration is required pursuant to the FINRA code if (1) arbitration is required by written agreement, or requested by the customer; (2) the dispute is between a customer and a member or associated person of a member; and (3) the dispute arises in connection with the business activities of the member or the associated person (except disputes involving the insurance business activities of a member that is also an insurance company). (*See* Pl. Ex. 28.)

Under FINRA Rule 12100(a), an "associated person" means a person associated with a member, as that term is defined in FINRA Rule 12100(r). Under FINRA Rule 12100(r), the term "person associated with a member" means… "(1) A natural person who is registered or has applied for registration under the Rules of FINRA; or (2) A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA." (*See* Pl. Ex. 28.)

## II.   CONCLUSIONS OF LAW

### A.   Permanent Injunction Standard

Plaintiffs seek a permanent injunction to prevent Defendants from continuing to prosecute the FINRA Arbitration. A party seeking a permanent injunction must show that:

> (1) it has succeeded on the merits;
> (2) irreparable injury will be suffered unless the injunction issues;
> (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and
> (4) if issued, the injunction would not be adverse to the public interest.

8

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006). The Eleventh Circuit has held that success on the merits is the most important factor in the injunction analysis (s*ee Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986); *White v. Alcon Film Fund, LLC*, 955 F. Supp. 2d 1381, 1383 (N.D. Ga. 2013)) and it is the only element at issue here.[4]

**B.    Plaintiffs Have Succeeded on the Merits**

Because the required elements for FINRA Rule 12200 are not met, permanent injunctive relief must issue.

**1.    Defendants Were Not Customers of the Individual Plaintiffs**

While FINRA rules do not clearly define the term "customer," the Eleventh Circuit has held that FINRA Rule 12200 must be construed in a predictable manner so as not to upset "the reasonable expectations of [FINRA] members." *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993) (abrogated on other grounds).  More recently, the court in *Morgan Keegan & Co. v. Shadburn*, on review of Eleventh Circuit precedent, noted the essential distinguishing factor in determining a customer relationship: a "direct transactional relationship" between the investor and the FINRA member or associated person. 829 F. Supp. 2d 1141, 1150 (M.D. Ala. 2011).

Other Circuits have echoed the Eleventh Circuit's call for predictability, giving bright

---

[4]    Indeed, the other requirements for the issuance of a permanent injunction are met here. Plaintiffs will suffer irreparable injury unless the injunction is issued.  *See Morgan Keegan & Co. v. Shadburn*, 829 F. Supp. 2d 1141, 1153 (M.D. Ala. 2011) ("Courts have concluded that a movant suffers irreparable harm when it is 'forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable.'") (internal citation omitted).  The threatened injury to Plaintiffs outweighs any damage to Defendants as a result of the permanent injunction.  *See Dean Witter Reynolds Inc. v. Pollack*, 1996 WL 1044969, at *4 (S.D. Fla. May 29, 1996) (permitting arbitration on nonarbitrable issues to proceed would cause greater harm to plaintiff than an injunction enjoining arbitration).  Finally, an injunction would not be adverse to public interest.  *See Morgan Keegan*, 829 F. Supp. 2d at 1153-54).

line guidance on the meaning of "customer" under FINRA rules.  In *UBS Fin. Servs. Inc. v.*

*Carilion Clinic*, the 4th Circuit held that:

> Coupling the contextual indicators from FINRA and the dictionary
> definition of "customer," we thus conclude that when FINRA uses
> "customer" in Rule 12200, it refers to one, not a broker or dealer,
> who purchases commodities or services from a FINRA member in
> the course of the member's business activities insofar as those
> activities are covered by FINRA's regulation, namely the activities
> of investment banking and the securities business. To construe
> "customer" in a manner that is consistent with the context of the
> FINRA Rules serves not only to provide customers of FINRA
> members the opportunity to arbitrate disputes arising in connection
> with FINRA members' business activities, but also to fulfill
> FINRA's charter to investigate and adjust grievances between the
> public and members.

706 F.3d 319, 325 (4th Cir. 2013) (internal quotations marks omitted).  And, in *Citigroup Global*

*Markets Inc. v. Abbar*, the Second Circuit held that there is need for a "simple" and "predictable"

definition of the term "customer" and defined it as follows:

> [A] "customer" under FINRA Rule 12200 is one who, while not a
> broker or dealer, either (1) purchases a good or service from a
> FINRA member, or (2) has an account with a FINRA member.

761 F.3d 268, 275 (2d Cir. 2014).  Decisions rendered after *Carilion Clinic* and *Abbar* have

followed suit.[5]

Under this framework, Defendants cannot be considered "customers" of POI for the

purposes of FINRA Rule 12200.  First, Defendants admit that they never had accounts, never

bought or sold any securities and never had any contractual relationship with POI. (ECF 171,

Joint Pretrial Stipulation at 5(d) and (e).)  They never were customers of POI.

---

[5]      *See, e.g., UBS Fin. Servs., Inc. v. Bounty Gain Enters.*, No. 14 Civ. 81603
(Marra/Matthewman), 2015 WL 4154124, at *13 (S.D. Fla. July 9, 2015) (Matthewman, M.J.)
(applying Fourth Circuit customer definition); *Sagepoint Fin., Inc. v. Small*, No. 15 Civ. 0571,
2015 WL 2354330, at *3-4 (E.D.N.Y. May 15, 2015) (applying Second Circuit customer
definition).

Nor can they be considered "customers" of the Individual Plaintiffs.  Defendants stipulate that they "opened custodial accounts with Banque Pictet in Geneva, Switzerland in 2008 and 2010, respectively." (ECF 171, Joint Pretrial Stipulation at 5(f).)  This reality is borne out in Defendants' account opening agreements, to which Banque Pictet is the sole counterparty. (Pl. Exs. 2, 3). Defendants received account statements from Banque Pictet (Pl. Ex. 5) and when Plaintiffs had questions concerning their bank accounts, they corresponded with Banque Pictet employees. (Pl. Ex. 6.)  Mr. Claus and Mr. Ostry, trustees for Defendants, testified that they have never met nor spoken with any of the Individual Plaintiffs. (TR2: 26, 68.)

Under *Wheat First*, *Carilion Clinic*, *Abbar* and their progeny, Defendants are not customers of the Individual Plaintiffs, because Defendants did not purchase a good or service from, or have an account with, the Individual Plaintiffs.  Conjuring a FINRA customer relationship under such circumstances would upset "the reasonable expectations" of FINRA member POI—which had never even heard of the Trusts until it received a copy of the Statement of Claim in the mail—and the Individual Plaintiffs.

Defendants urge the Court to simply disregard the existence of Banque Pictet and consider the Trusts customers of the Individual Plaintiffs.  But the evidence presented at trial established that Banque Pictet is a prominent Swiss bank, and has been for over 200 years. (TR1: 187.)  It has approximately 40,000 customers, 2,500 employees in branches across Switzerland and $250 billion in holdings.  (*Id*.)  It competes with some of the world's leading banks.  (*Id*.) Banque Pictet is highly regulated by the Swiss bank regulatory authority (TR1: 192-95), observes corporate formalities and is in every sense an independent legal entity.

Defendants offer no evidence to disregard, bypass or "look through" Banque Pictet. Indeed, the only evidence that Defendants can muster in favor of their "customer" theory lacks

11

both probative value and credibility.  For example, Mr. Ostry testified that he relied on a video found on Banque Pictet's website in concluding that he was a customer of the Individual Plaintiffs:

> That's what really moved me was the great video that they had. And so no matter where my money was anywhere in the Pictet family, if you call it a family, I felt comfortable that the eight partners would -- would back me up, and, you know . . .
>
> It's on the public website that they would back up not only in writing, they would back up and walk with the customers 100 percent of the way; all eight partners were my friends, my partners in this thing. And I trusted them implicitly. I didn't expect the next day to have a million dollars disappear on me and they don't even tell you where it went. It's just the opposite of what happened. They stole the money and took it and robbed me, and it's a bank I was getting statements from, and I'm just outraged at the whole set of events that happened.

(TR2: 43-44.)  But Mr. Ostry also testified that that he has thirty years of experience in the securities industry (TR2: 48), and that he personally signed documentation[6] opening custodial bank accounts with Banque Pictet (TR2: 60), not the Individual Plaintiffs.  That Mr. Ostry believed he was a customer of the Individual Plaintiffs, to the extent such belief bears relevance to whether a FINRA customer relationship actually exists, is not credible.[7]

Defendants also testified that they relied on statements on Banque Pictet's website or

---

[6]    Both Trustees suggested on direct that they did not fully read the account-opening documents they signed.  However, "'[a] party who signs an instrument is presumed to know its contents . . . He cannot avoid his obligations thereunder by alleging that he did not read the contract, or that the terms were not explained to him, or that he did not understand the provisions." *Mays v. Keiser School, Inc.*, 2011 WL 1539675, at *1 (S.D. Fla. Mar. 31, 2011) (*quoting Citibank, N.A. v. Dalessio*, 2010 WL 5137601 (M.D. Fla. Dec. 10, 2010)).

[7]    Mr. Ostry's credibility is further called into doubt in light of his sanctions from NASD for "reproduce[ing] and pass[ing] to other persons portions of the Series 62 qualification examination, which compromised the effectiveness and/or confidentiality of the examination." (Pl. Ex. 21.)  Mr. Ostry was also impeached after claiming, for the first time at trial, that he spoke to a POI employee (a "Mr. Zimmerman") prior to signing Banque Pictet account-opening documents. (TR2: 64.)  In prior testimony, Mr Ostry denied having ever spoken to any POI employees.  (*Id*. at 65.)

other promotional materials indicating that the Individual Plaintiffs are personally responsible for Banque Pictet's liabilities in concluding that they were customers of the Individual Plaintiffs. (*See, e.g.*, TR2: 8-9; Def. Exs. 34, 47.)  As an initial matter, such statements constitute non-actionable puffery, and cannot be deemed sufficient to establish a customer relationship under the case law set forth above.  *Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1342 (S.D. Fla. 2012) ("[A]lleged misrepresentations identified by the Plaintiffs as appearing on Defendant's website are non-actionable puffery and sales talk.").  Indeed, nothing about the substance of these marketing statements warrants the wholesale disregard of the existence of a highly regulated Swiss bank.  *See e.g., Ayco Co. v. Becker*, 2011 WL 3651027, at *5 (N.D.N.Y. Aug. 18, 2011) (declining to pierce the corporate veil and noting that purported alter-ego's "participat[ion] in a highly regulated industry that requires strict compliance with FINRA rules" weighs against finding the "type of day-to-day control that is required to disregard the [FINRA member's] distinct identity.").  Moreover, Mr. Salamolard testified that the Individual Partners are personally liable only in the event that the two hundred year-old Banque Pictet is rendered insolvent.  (TR1: 237-38.)

Defendants place great weight on evidence showing that before the Trusts' accounts were opened at Banque Pictet, their applications first had to be presented to the "salon," a meeting at which typically one or two Individual Plaintiff representatives were present. (TR1: 209.)  As a routine part of account-opening, due diligence managers and relationship managers at Banque Pictet would present new accounts to the salon, consisting normally of a group of high level executives at the bank and one or two of the Individual Plaintiffs, to flag potential commercial or reputational risk. (*Id.*)  For "plain vanilla," "easy" applications like those presented by Defendants, accountholder names are simply read aloud and "vetoes" from Individual Plaintiffs

or others "almost never happen[]." (TR1: 211.)  Nothing about this routine administrative

process somehow permits disregarding the existence of the Swiss Bank or renders the

Defendants customers of the Individual Plaintiffs.

Finally, Defendants argue that two Eleventh Circuit decisions compel the Court to deem

the Trusts "customers" under FINRA rules.  Specifically, Defendants point to *Multi-Financial*

*Securities Corp. v. King*, 386 F.3d 1364 (11th Cir. 2004) (TR2: 111) and *MONY Sec. Corp. v.*

*Bornstein*, 390 F.3d 1340 (11th Cir. 2004) (TR2: 115).  The Court already referenced and

incorporated Magistrate Judge Matthewman's analysis of *King* and *Bornstein*, which deemed

both of these cases "distinguishable" and "inapposite." (Matthewman Report at 12-13.)  In *King*,

it was undisputed that a registered representative of a FINRA member had actually provided

investment advice (and sold unregistered securities) to the defendant. 386 F.3d at 1365.  The

*King* court held that, even though the defendant dealt with the FINRA member's representative

and not with the FINRA member itself, the FINRA member could be compelled to arbitrate. *Id*.

at 1371.  In *Bornstein*, a FINRA member's registered representative went to an investor's home

and provided investment advice.  As in *King*, the *Bornstein* court reached the conclusion that the

FINRA member must arbitrate despite the fact that the investor was clearly a "customer" of its

registered representative. (*Id*. at 1341) (noting that the FINRA member's representative went to

the investors' home to provide investment advice).  As one court in the Eleventh Circuit has

since observed:

> In *King* and *Bornstein*, the issue was whether the broker-dealer
> would be compelled to arbitrate when its admitted agent or
> representative (associated person) sold securities not issued,
> marketed or approved by the broker-dealer to customers of the
> associated person. The issue in both turned on whether the
> customer of an associated person is also the customer of the
> broker-dealer who supervised the associated person, even if the
> broker-dealer had no knowledge of the transaction. In both cases,

> the broker-dealer was compelled to arbitrate because the court
> ultimately found that the investor was a customer of both the
> associated person and the broker-dealer.

*AXA Distribs., LLC v. Bullard*, 2008 WL 5411940, at \*7 n. 16 (M.D. Ala. Dec. 24, 2008). Here,

Defendants were allegedly defrauded by Callahan, who was never a representative of POI,

Banque Pictet or the Individual Plaintiffs. And none of the Plaintiffs provided investment advice

or sold securities to Defendants.

Therefore, while Defendants urge the Court to conclude that FINRA "customers" include

any non-broker or non-dealer, such a reading of the FINRA Rules is not compelled by Eleventh

Circuit precedent and would have absurd consequences. *See Morgan Keegan*, 829 F. Supp. 2d at

1149 (distinguishing *King*, and rejecting as overly broad the notion that a customer is anyone

who is not a broker or dealer; s*ee also* Matthewman Report at 14 ("such a conclusion would lead

to an absurd result").[8]

### 2.    The Individual Plaintiffs are not Associated Persons of POI

Even if Defendants somehow could be considered FINRA "customers" of the Individual

Plaintiffs (which they cannot), FINRA Rule 12200 still would not require arbitration because the

Individual Plaintiffs are not associated persons of POI.[9]  Under FINRA Rule 12100(r), the term

"associated person" or "person associated with a member" means:

---

[8]     Such results were reflected at trial, when Defendants' counsel declared that the District
Court Judge was a "customer" of Plaintiffs under counsel's reading of FINRA rules. (TR2: 109.)

[9]     At trial, Defendants suggested that the issue of whether the Individual Plaintiffs were
associated persons of POI had already been resolved by the Court in its January 28, 2016 Order
(ECF No. 152), and Plaintiffs thus were barred from reargument under the "law of the case"
doctrine. (TR2: 106.)  However, the Court's January 28 Order contains no ruling on this issue,
and merely states that *Defendants contend* that the Individual Plaintiffs were associated persons
of POI.  (ECF No. 152 at 6.)  Indeed, in their Joint Pretrial Stipulation, the parties agreed that this
was an issue of fact for the Court to decide at trial. (*See* Joint Pretrial Stipulation, ECF. No. 171,
at 6(b)) (listing among the "Issues of Fact to be Litigated at Trial, "whether the Individual
Plaintiffs are "associated persons" of Pictet Overseas under FINRA Rules."))

> (1) A natural person who is registered or has applied for
> registration under the Rules of FINRA; or (2) A sole proprietor,
> partner, officer, director, or branch manager of a member, or other
> natural person occupying a similar status or performing similar
> functions, or a natural person engaged in the investment banking or
> securities business who is directly or indirectly controlling or
> controlled by a member, whether or not any such person is
> registered or exempt from registration with FINRA under the By-
> Laws or the Rules of FINRA.

(*See* Pl. Ex. 28.)

Defendants contend that the Individual Plaintiffs are associated persons of POI because they are natural persons engaged in the investment banking or securities business *in Switzerland* (through Banque Pictet) and that they indirectly control POI by virtue of their 12.5% ownership interest in its parent company, Sopafin. (TR2: 132-33). Defendants' theory fails for several reasons. First, the evidence showed that the Individual Plaintiffs do not "control" POI. Plaintiffs' expert, a former General Counsel of FINRA, Mr. Marc Menchel, testified that each Individual Plaintiffs' 12.5% ownership interest in a broker-dealer is insufficient to *presume* control. (TR1: 141.) Mr. Lê testified that the Individual Plaintiffs have no involvement whatsoever in the business of POI, so there is no *actual* control exercised over the broker-dealer. (TR1: 32.) And while Defendants emphasize POI's disclosure of the Individual Plaintiffs as "control persons" on their SEC Form BD, Mr. Lê testified that this disclosure was made in the interest of transparency, based on the definition of "control" as used specifically for Form BD, and solely for the purposes of Form BD. (TR1: 60, 70.) Mr. Menchel testified that listing someone as a "control person" on a Form BD disclosure does not transform that person into an associated person under FINRA rules, and that such listing appears to have been an error. (TR1: 181.)[10]

---

[10] Mr. Menchel elaborated: "[I]f you put something down on a ministerial filing by mistake or even on purpose, and it is at odds with the facts, it doesn't change a person who is not an

16

Second, even if Defendants had established that the Individual Plaintiffs were engaged in the securities business in Switzerland (and Defendants offered no evidence of this),[11] the evidence shows that the Individual Plaintiffs never were involved in the securities business *of POI*.  Mr. Menchel testified that in order for an individual to be considered an associated person of a member under FINRA rules, he or she must have involvement in the business of the FINRA member.  (TR1: 166 (explaining that the "industry standard is clearly [an associated person is] involved in the business of the member").)  The Individual Plaintiffs had no such involvement.

*Sykes v. Escueta* supports Mr. Menchel's testimony.  2010 WL 4942608 (N.D. Cal. Nov. 29, 2010). In *Sykes*, the defendants brought a FINRA arbitration claim against a broker-dealer, and also named an indirect owner of the broker-dealer as a respondent, asserting that he was an "associated person" of a FINRA member by virtue of his purported "control" over the broker-dealer and his general involvement in the securities business. *Id*. at *3. The indirect owner (Sykes) moved for an injunction, which the court granted.  The *Sykes* court explained:

> Defendants argue that Rule 12100(r)(2) should be interpreted to confer "associated person" status on anyone who is both (1) engaged in the investment banking or securities business and (2) directly or indirectly controlling a FINRA member. Defendants present evidence in the form of FINRA BrokerCheck reports and news articles that Sykes was engaged in the investment banking and securities business, and argue that this, when taken with Sykes' indirect ownership of GAF, is sufficient to satisfy Rule 12100(r)(2).  Defendants cite to no cases in support of this interpretation, and cite no cases in which a Court compelled a non-FINRA member to participate in arbitration.
>
> The Court finds Defendants' proposed interpretation of the FINRA Code is implausible and unsupported by the law. As the Court has

associated person into an associated person because you happen to characterize them some way on a filing." (TR1: 179.)

[11]     This supposition is based on Defendants' faulty theory that Banque Pictet can be disregarded, and its banking and securities activities assigned to the Individual Plaintiffs.  That theory is disposed of above.

> stated, FINRA's power to compel parties to arbitrate must be rooted in some contract. Defendants' proffered interpretation would eviscerate this requirement; Defendants essentially ask the Court to find that FINRA has the authority, through its arbitration code, to establish the outer jurisdictional limits of its arbitration proceedings.
>
> A more plausible reading of Rule 12200 is that any FINRA member can be compelled to arbitrate a claim if there exists a dispute between a customer and a person associated with the member, and if the dispute arises in connection with the business activities of the member or the associated person. Under this reading, Rule 12200 does not define the class of individuals that FINRA can compel to arbitrate; rather, it defines the range of disputes FINRA can compel its members to arbitrate.

*Id*. at *3. Just like in *Sykes*, the Individual Plaintiffs here cannot be compelled to arbitrate, based merely on an indirect ownership interest in a FINRA member and an alleged, unrelated involvement in the securities industry. They are not associated persons of POI. This conclusion is validated by FINRA, which itself audits Pictet Oveseas extensively, is aware that POI neither lists the Individual Plaintiffs as associated persons nor supervises them as such, and has never taken issue with these facts.

3.   The Dispute Does Not Arise from the Business Activities of POI

Finally, the present dispute is not arbitrable under FINRA Rule 12200 because it does not arise from the business activities of a FINRA member. As the *Sykes* court noted, FINRA Rule 12200 does not define a class of individuals who must arbitrate, but rather a class of disputes that must be arbitrated. 2010 WL 4942608, at *3. A dispute is not subject to mandatory arbitration under Rule 12200 unless it arises in connection with the business activities of the member or the associated person. (*See* Pl. Ex. 28.) Defendants propose a virtually limitless view of what constitutes the "business activities of the member or associated person." At closing argument, Defendants' counsel argued, in response to a hypothetical presented by the Court, that the owner of a broker-dealer who traveled to Africa and committed a fraud there in the course of his

18

personal life, unrelated to his broker-dealer business, would nonetheless have to arbitrate with his victim in the FINRA forum.  (TR2: 127.)  Defendants reasoned that such an exercise of FINRA jurisdiction is justified because "FINRA doesn't want scoundrels controlling broker-dealers." (TR2: 127.)

But Defendants' theory is not supported by law or by common sense.[12]  In *Valentine Capital Asset Management, Inc. v. Agahi*, a California appellate court considered this precise issue with respect to FINRA Rule 13200, which is nearly identical to Rule 12200 but governs disputes between FINRA members. 174 Cal. App. 4th 606 (Cal. Ct. App. 2009).   Like Rule 12200, Rule 13200 requires arbitration only if the dispute arises out of the business activities of an individual or an associated person of a FINRA member.  *Id*. at 616.  The court in *Valentine* held that, "common sense dictates that the phrase 'business activities of ... an associated person' must have *some* limitation" (*Id*. at 615) (emphasis in original). The *Valentine* court explained:

> Indeed, a variety of disputes, utterly unrelated to the securities industry, might arise between individuals who happen to be associated persons. For example, a registered representative might also be a real estate agent who sells a home to another person who happens to be a registered representative. Other registered representatives, engaged in the side business of collecting and selling art, might become embroiled in a dispute over the sale of a painting that one claims to be fake. These disputes would certainly arise out of the parties' business activities, but neither the parties nor FINRA would reasonably expect these private disputes to be

---

[12]     Mr. Menchel was brutally dismissive of Defendants' theory:

> The ridiculousness of what you're proposing is it's an extension of jurisdiction that the SEC couldn't have. Right? The SEC could not say, you know, we regulate you, so we regulate every other entity that is in the same business as you. But miraculously in your reading, as you want me to take it on, associated person applies to any person in being that happens to be engaged in securities and investments anywhere in the world. . . . There's not a person in the industry, in regulation, in the world who is knowledgeable who believes that. (TR1: 172.)

appropriate for an arbitration established as part of the regulation of stock brokerage firms. While these types of non-investment disputes may be relatively unlikely, the construction of Rule 13200 must nonetheless countenance the possibility. Without an appropriate limit on the concept of "business activities," FINRA would be forced to handle disputes outside its purpose and concerns, beyond the expertise of FINRA arbitrators, and beyond the reasonable expectations of the parties involved.

Since there must be some limit to the scope of "business activities" subject to mandatory arbitration under FINRA, we must next find an appropriate means of defining the limitation. We need look no further than the words of Rule 13200 itself. The mandate to arbitrate disputes arising out of "business activities of . . . an associated person," reasonably read, must require arbitration of disputes only if they arise out of the business activities of an individual *as* an associated person of a FINRA member. With this interpretation, FINRA and the registered representatives under its jurisdiction are assured that arbitration will pertain to matters with some nexus to the activity actually regulated by FINRA. This is nothing more than the common sense meaning of the plain language contained in Rule 13200, and any other interpretation would wrongly strip individuals of their civil jury trial rights concerning subject matter in which FINRA maintains no regulatory interest.

(*Id*. at 615–16) (emphasis in original).

In this case, the dispute unquestionably arises from Defendants' custodial bank accounts opened with and maintained by Banque Pictet in Switzerland.  The evidence showed that POI is not even licensed to engage in such business, and that Banque Pictet's custodial business is not regulated by FINRA.  Thus, even assuming that Banque Pictet's custodial banking services can be ascribed to the Individual Plaintiffs (they cannot), and that the Individual Plaintiffs are associated persons of POI (they are not), the dispute does not arise from the business activities of a FINRA member, here POI, or the business activities of the Individual Plaintiffs as associated persons of POI.  A dispute about the Trusts' Swiss bank accounts has no "nexus to the activity actually regulated by FINRA." *Id*. at 616.  This dispute is not arbitrable under FINRA Rule 12200.

4.      Defendants Fail to Justify Alter Ego or Veil Piercing

To the extent that Defendants contend that the Plaintiffs and Banque Pictet are "alter

egos" or that the corporate veil should be pierced here, such contention is without merit.  Under

Eleventh Circuit law, a party seeking to pierce the corporate veil must prove:

> (1) the shareholder dominated and controlled the corporation to
> such an extent that the corporation's independent existence was in
> fact non-existent and the shareholders were in fact alter egos of the
> corporation;
>
> (2) the corporate form must have been used fraudulently or for an
> improper purpose; and
>
> (3) the fraudulent or improper use of the corporate form caused
> injury to the claimant.

*Lobegeiger v. Celebrity Cruises, Inc.*, 869 F. Supp. 2d 1350, 1354) (S.D. Fla. 2012) *citing*

*Molinos Valle Del Cibao, C por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011.)   Defendants

noted that POI and Banque Pictet have the same logo, that some correspondence refers only to

"Pictet" and that the Banque Pictet's website directs U.S. customers to POI.  However, the

evidence showed that both Banque Pictet and POI are separate legal entities, maintain their own

books and records, adhere to distinct sets of regulatory requirements, are independently managed

and operated and engage in distinct businesses.  The evidence further showed that the Individual

Plaintiffs have no involvement in the business of POI.  Defendants have not met their heavy

burden to pierce the corporate veil as between Plaintiffs and Banque Pictet.[13]

---

[13]      Derivative of their veil-piercing theory, Defendants also appear to argue that Brian
Callahan, the independent investment manger that they engaged, was an "agent" of "Pictet."  To
establish an agency relationship, a party must show: (1) acknowledgment by the principal that
the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the
principal over the actions of the agent. *Attorney's Title Ins. Fund, Inc. v. Regions Bank*, 491 F.
Supp. 2d 1087, 1096 n.5 (S.D. Fla.2007).  Defendants submitted no evidence to support an
agency relationship between Brian Callahan and Plaintiffs.  Moreover, Mr. Le (TR1: 46) and Mr.

C.   **Declaratory Judgment**

Plaintiffs seek a declaratory judgment that Defendants do not qualify as "customers" of Plaintiffs within the meaning of FINRA Rules and that the Arbitration is improper.  Pursuant to 28 U.S.C. § 2201, the Court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  Here, the parties are interested because there is an existing and pending arbitration claim before FINRA.  As outlined above, Defendants claims are not arbitrable.  The declaratory relief requested by Plaintiffs is therefore properly granted.

D.   **Defendants' Affirmative Defenses**

In their Answer and Affirmative Defenses (ECF No. 64), Defendants raise four affirmative defenses.  Defendants have failed to satisfy their burden of proof with respect to the first affirmative defense, waiver, because they have no evidence suggesting that Plaintiffs waived their rights to the relief they are seeking.  Defendants' second, third and fourth "affirmative defenses" (ECF No. 64 at 7) are not proper affirmative defenses; rather, they are allegations relating the merits of Plaintiffs' claims.

**III.   CONCLUSION**

Accordingly, after due consideration, it is **ORDERED, ADJUDGED and DECREED** as follows:

Having found in favor of Plaintiffs on its claim for a permanent injunction, Defendants are **BARRED AND PERMANENTLY ENJOINED** from prosecuting the Arbitration against Plaintiffs.

The Court finds in favor of Plaintiffs on their claim for declaratory judgment.  The Court

---

Salomolard (TR1: 217) testified that Mr. Callahan was never an employee or registered representative of either POI or Banque Pictet.

finds and declares that Defendants are not customers of any of the Plaintiffs under the FINRA

Rules.  The Court also finds and declares that Defendants' claims in the Arbitration are not

arbitrable against Plaintiffs.

The Court retains exclusive jurisdiction over this action to assess costs.

DONE AND ORDERED in chambers at West Palm Beach, Palm Beach County, Florida

this _____ day of _____, 2017.


_____
KENNETH MARRA
United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of February, 2017, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on the parties listed in the service list below, either via transmission of Notices of Electronic Filing generated by CM/ECF or via overnight mail for those parties who are not authorized to receive electronically Notices of Electronic Filing:

By:  /s/ Ian M. Ross
Ian M. Ross

## SERVICE LIST

Curtis Carlson, Esq.
**CARLSON & ASSOCIATES P.A.**
One Southeast Third Avenue
Suite 1200
Miami, FL  33131
Tel:  (305) 372-9700
Fax:  (305) 372-8265
Email:  carlson@carlson-law.net

*Counsel for Defendants*