UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-81088-CIV-MARRA/MATTHEWMAN

PICTET OVERSEAS INC., PHILIPPE )
BERTHERAT, REMY ANTOINE BEST, )
RENAUD FERNAND DE PLANTA, )
JACQUES JOSEPH DE SAUSSURE, )
BERTRAND FRANCOIS LAMBERT )
DEMOLE, JEAN-FRANCOIS DEMOLE, )
MARC PHILIPPE PICTET, and )
NICOLAS LUCIEN PICTET, )
   )
              Plaintiffs, )
   )
v. )
   )
HELVETIA TRUST and AAA )
GROUP INTERNATIONAL TRUST, )
   )
             Defendants. )
_____)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court. Pursuant to Fed. R. Civ. P. 52(a), the Court makes these findings of fact and conclusions of law.

Plaintiffs[1] initiated this action seeking declaratory and injunctive relief to enjoin an arbitration proceeding brought before the Financial Industry Regulatory Authority ("FINRA") by Defendants Helvetia Trust and AAA Group International Trust ("Defendants" or "Trusts"). The issue before the Court is whether FINRA Rule 12200, which requires the FINRA arbitration of disputes between "customers" and FINRA members, or "associated persons" of FINRA

---

[1] Plaintiffs include Pictet Overseas, Inc. ("POI"), Philippe Bertherat, Remy Antoine Best, Renaud Fernand De Planta, Jacques Joseph De Saussure, Bertrand Francois Lambert Demole, Jean-Francois Demole, Marc Philippe Pictet and Nicolas Lucien Pictet (collectively, the "Individual Plaintiffs," and together with POI, "Plaintiffs").

members, that arise in connection with the business activities of the member or associated person, compels Plaintiffs to arbitrate with Defendants.

## PROCEDURAL HISTORY

In or around[2] July 2013, Defendants commenced a FINRA arbitration proceeding (the "Arbitration") against POI, the Individual Plaintiffs and a number of POI's corporate affiliates by filing a statement of claim with FINRA. In the Arbitration, Defendants sought $1.8 million in actual damages, treble damages and $100 million in punitive damages. (Pl. Ex. 1, FINRA Statement of Claim.) The thrust of Defendants' Arbitration claim was that Plaintiffs (and various POI affiliates) were responsible for losses Defendants incurred when their asset manager, Brian Callahan, misappropriated funds held in Defendants' custodial bank accounts at Banque Pictet. *Id*. Banque Pictet is a Swiss bank headquartered in Geneva, Switzerland; it is not a FINRA member and it is not a party to this action. POI is a broker-dealer and a FINRA member located in Montreal, Canada.

On October 23, 2013, POI initiated this action, alleging that it has never had any agreement to arbitrate with Defendants, does not consent to arbitrate and is not otherwise required to arbitrate with Defendants under FINRA rules. (ECF No. 1.) The complaint sought two forms of relief: (1) an injunction permanently enjoining the Arbitration; and (2) a declaration that Defendants are not customers of POI or any of its associated persons and Defendants' claims are not arbitrable. (*Id*.) On November 27, 2013, Plaintiffs amended the complaint to add the Individual Plaintiffs. (ECF No. 36.) On December 16, 2013, Plaintiffs amended the complaint for a second time, adding detail regarding the citizenship of each of the Individual Plaintiffs and of the Defendants' trustees. (ECF No. 43.)

---

[2]   Defendants' Statement of Claim is undated.

At the time Plaintiffs commenced this action, they also moved for a preliminary and permanent injunction. (ECF No. 3.) Defendants opposed the motion. (ECF No. 11.) Following a January 2, 2014 evidentiary hearing on Plaintiffs' motion for a preliminary and permanent injunction, Magistrate Judge Matthewman issued a Report and Recommendation (the " Report"), recommending that a preliminary and permanent injunction should issue. (ECF No. 44.) According to the Report, Defendants were not customers of POI or of the Individual Plaintiffs (*id*. at 11-15) and Plaintiffs had no reasonable expectation that they might face FINRA arbitration with the Trusts. (*Id.* at 15.) Magistrate Judge Matthewman concluded that the Court should issue a preliminary injunction and a permanent injunction, because "additional discovery and/or a second evidentiary hearing would not change the fact that Defendants were never customers of Plaintiff [POI], the FINRA member, or the [I]ndividual Plaintiffs . . . [and] Defendants have not proffered any anticipated discovery that could conceivably alter the result in this case." (*Id.* at 21.)

By order dated February 7, 2014, the Court adopted the Report's findings of fact and conclusions of law and its recommendation that a preliminary injunction be issued. (ECF No. 49.) In so doing, the Court noted Defendants' request to seek discovery and declined to issue a permanent injunction until Defendants were afforded the opportunity to seek that discovery. (*Id*.) Discovery in this action proceeded for over a year, after which both parties filed dispositive motions. (ECF Nos. 135, 136.) The Court denied both motions and set this case for a bench trial. (ECF No. 152.) Pursuant to the Court's Order granting a preliminary injunction (ECF No. 49), the Arbitration has been stayed while this action is pending.

I. <u>**FINDINGS OF FACT**</u>

    A. <u>**The Parties**</u>

POI is a Canadian broker-dealer and a FINRA member. (TR1: 12; *see also* Joint Pretrial

Stipulation at 5(a).) It is headquartered in Montreal, Quebec, where its only office is located and where all of its 35 employees are based. (TR1: 17; *see also*, Joint Pretrial Stipulation at 5(c).) POI is an execution broker, specializing in the settlement of transactions involving equities, bonds, options and foreign exchange for institutional investors. (TR1: 13.) It does not hold client funds or securities and POI is not licensed to maintain custody accounts by virtue of its FINRA membership agreement. (TR1: 14, 15.) POI first learned of the Arbitration when it received by mail a copy of the Statement of Claim in September of 2013.

POI is a wholly owned subsidiary of Sopafin (Luxembourg) S.A. ("Sopafin"), which in turn is owned by the eight Individual Plaintiffs. (TR1: 22-23*; see also*, Pl. Ex. 18.) The Individual Plaintiffs, each of whom is domiciled in Switzerland, are the former general partners of nonparty Banque Pictet. Banque Pictet is a large, private Swiss bank headquartered in Geneva. (TR1: 187.) Founded in 1805, Banque Pictet has approximately 40,000 customers and 2,500 employees in branches located in various cities in Switzerland with approximately 250 billion Swiss Francs (roughly equivalent to $250 billion) in holdings. (*Id*.) It competes with some of the most prominent banks in the world, including UBS and Credit Suisse. (*Id*.) Banque Pictet is not regulated by FINRA. (TR1: 195.) Instead, it is regulated by the Swiss Financial Market Supervisory Authority, known as "FINMA" which is a regulatory body in Switzerland that is unrelated to FINRA. (TR1: 192-95.) Unlike POI, Banque Pictet offers custodial services to customers. (TR1: 195.) These services involve holding assets, such as cash or securities, on behalf of bank customers in Switzerland. (*Id*.) Prior to 2014, Banque Pictet was organized as a limited partnership under Swiss law. (TR1: 190-91.) In 2014, Banque Pictet changed its legal structure to Société Anonyme, or S.A, which is akin to a corporate structure under U.S. law. (TR1: 190.)

Defendants are offshore trusts governed by the laws of St. Lucia, West Indies. (ECF No. 171, Joint Pretrial Stipulation at 5(h) and (k).)

**B.     Defendants' Relationship with Brian Callahan and Opening of Custodial Accounts with Banque Pictet**

In 2008 and 2010, Defendants opened custodial accounts with Banque Pictet in Geneva. (ECF 171, Joint Pretrial Stipulation at 5(f).) Defendants did so through the third-party asset manager they had selected, Brian Callahan. (TR2: 7; TR2: 39-40.) Brian Callahan was never an employee, registered representative or agent of either Banque Pictet (TR1: 217) or of POI (TR1: 46). In fact, neither Mr. Callahan, nor his company Horizon Global Advisors Ltd. (and/or Horizon Global Advisors, LLC), had any relationship with Banque Pictet or with POI. (TR1: 46, 218.) Mr. Callahan was engaged directly by Defendants to invest their funds held in their custodial bank accounts at Banque Pictet in Geneva. (*See* TR1: 222-23).

The account-opening agreements for Defendants' custodial accounts with Banque Pictet contained forum selection and choice-of-law provisions, which state as follows:

> The relationship between the Bank and the Client shall be governed exclusively by Swiss law.
>
> Any dispute concerning the relationship between the Bank and the Client shall be subject to the exclusive jurisdiction of the Courts of Geneva. An appeal shall lie to the Federal Supreme Court of Switzerland is reserved.
>
> The place of execution, the place of prosecution and the place of jurisdiction shall be Geneva. The Bank shall nonetheless be entitled to initiate proceedings in the jurisdiction of domicile of the Client or any other competent jurisdiction.

(Pl. Exs. 2 and 3, Articles 38 and 39.) These are standard provisions used in all Banque Pictet

5

account-opening agreements. (TR1: 215-16.)

### C. POI and the Individual Plaintiffs

At all relevant times each Individual Plaintiff held a 12.5% ownership interest in POI's parent holding company, Sopafin (*see* Pl. Ex. 18). None of the Individual Plaintiffs had any involvement in the operations of POI, and none is considered by POI to be its associated person. (TR1: 32.) As a FINRA regulated broker-dealer, POI is charged with supervising those "associated persons" that conduct its day-to-day business. (TR1: 30.) POI is required to maintain a list of its associated persons as part of its compliance manual. (*Id.*) Because the Individual Plaintiffs are not engaged in POI's daily business and have no involvement in its broker activities, POI does not supervise the Individual Plaintiffs and does not list them on the compliance manual as associated persons. (TR1: 32.) Approximately every three years, FINRA conducts intensive, on-site audits of POI during which FINRA representatives review, among other things, the broker dealer's compliance manual and its list of associated persons. (TR1: 34-36.) POI has never been notified by FINRA that its associated person list was in any way inadequate. (TR1: 36.)

### D. FINRA Rules 12200 and 12100(a)

Under FINRA Rule 12200, arbitration is required pursuant to the FINRA code if (1) arbitration is required by written agreement, or requested by the customer; (2) the dispute is between a customer and a member or associated person of a member; and (3) the dispute arises in connection with the business activities of the member or the associated person (except disputes involving the insurance business activities of a member that is also an insurance company). (*See* Pl. Ex. 28.)

Under FINRA Rule 12100(a), an "associated person" means a person associated with a member, as that term is defined in FINRA Rule 12100(r). Under FINRA Rule 12100(r), the term

6

"person associated with a member" means… "(1) A natural person who is registered or has applied for registration under the Rules of FINRA; or (2) A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA." (*See* Pl. Ex. 28.)

## II. CONCLUSIONS OF LAW

### A. Permanent Injunction Standard

Plaintiffs seek a permanent injunction to prevent Defendants from continuing to prosecute the FINRA Arbitration. A party seeking a permanent injunction must show that:

> (1) it has succeeded on the merits;
> (2) irreparable injury will be suffered unless the injunction issues;
> (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and
> (4) if issued, the injunction would not be adverse to the public interest.

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).

### B. Plaintiffs Have Succeeded on the Merits

Because the required elements for FINRA Rule 12200 are not met, permanent injunctive relief must issue.[3]

---

[3] The other requirements for the issuance of a permanent injunction are also met here. Plaintiffs will suffer irreparable injury unless the injunction is issued. *See Morgan Keegan & Co. v. Shadburn*, 829 F. Supp. 2d 1141, 1153 (M.D. Ala. 2011) ("Courts have concluded that a movant suffers irreparable harm when it is 'forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable.'") (internal citation omitted). The threatened injury to Plaintiffs outweighs any damage to Defendants as a result of the permanent injunction. Finally, an injunction would not be adverse to public interest. *Id.* at 1153-54.

1.      Defendants Were Not Customers of the Individual Plaintiffs

While FINRA rules do not clearly define the term "customer," the Eleventh Circuit has held that FINRA Rule 12200 must be construed in a predictable manner so as not to upset "the reasonable expectations of [FINRA] members." *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993) (abrogated on other grounds).  More recently, the court in *Morgan Keegan & Co. v. Shadburn*, on review of Eleventh Circuit precedent, noted the essential distinguishing factor in determining a customer relationship: a "direct transactional relationship" between the investor and the FINRA member or associated person. 829 F. Supp. 2d at 1150.

Decisions from other courts give additional guidance on the meaning of "customer" under FINRA rules.  In *UBS Fin. Servs. Inc. v. Carilion Clinic*, the Fourth Circuit held that:

> Coupling the contextual indicators from FINRA and the dictionary definition of "customer," we thus conclude that when FINRA uses "customer" in Rule 12200, it refers to one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are covered by FINRA's regulation, namely the activities of investment banking and the securities business. To construe "customer" in a manner that is consistent with the context of the FINRA Rules serves not only to provide customers of FINRA members the opportunity to arbitrate disputes arising in connection with FINRA members' business activities, but also to fulfill FINRA's charter to investigate and adjust grievances between the public and members.

706 F.3d 319, 325 (4th Cir. 2013) (internal quotations marks omitted).  *See also UBS Fin. Servs., Inc. v. Bounty Gain Enters.*, No. 14 Civ. 81603, 2015 WL 4154124, at *13 (S.D. Fla. July 9, 2015) (applying Fourth Circuit customer definition).

And, in *Citigroup Global Markets Inc. v. Abbar*, the Second Circuit held that there is need for a "simple" and "predictable" definition of the term "customer" and defined it as follows:

> [A] "customer" under FINRA Rule 12200 is one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member.

761 F.3d 268, 275 (2d Cir. 2014).

In view of this authority, Defendants cannot be considered "customers" of POI for the purposes of FINRA Rule 12200. Defendants admit that they never had accounts, never bought or sold any securities and never had any contractual relationship with POI. (ECF 171, Joint Pretrial Stipulation at 5(d) and (e).) Defendants were not customers of POI.

Nor can they be considered "customers" of the Individual Plaintiffs. Defendants stipulated that they "opened custodial accounts with Banque Pictet in Geneva, Switzerland in 2008 and 2010, respectively." (ECF 171, Joint Pretrial Stipulation at 5(f).) Moreover, Banque Pictet is the sole counterparty to Defendants' account opening agreements. (Pl. Exs. 2, 3). Defendants received account statements from Banque Pictet (Pl. Ex. 5) and when Plaintiffs had questions concerning their bank accounts, they corresponded with Banque Pictet employees. (Pl. Ex. 6.) Mr. Claus and Mr. Ostry, trustees for Defendants, testified that they have never met or spoken with any of the Individual Plaintiffs. (TR2: 26, 68.) Under *Wheat First*, *Carilion Clinic* and *Abbar*, Defendants are not customers of the Individual Plaintiffs, because Defendants did not purchase a good or service from, or have an account with, the Individual Plaintiffs.

Defendants urge the Court to disregard the existence of Banque Pictet and consider the Trusts customers of the Individual Plaintiffs. The Court rejects this invitation. Defendants offer no credible evidence to disregard, bypass or "look through" Banque Pictet. Defendants' evidence on this point is unpersuasive. For example, Mr. Ostry testified that he relied on a video found on Banque Pictet's website in concluding that he was a customer of the Individual Plaintiffs:

9

> That's what really moved me was the great video that they had.
> And so no matter where my money was anywhere in the Pictet
> family, if you call it a family, I felt comfortable that the eight
> partners would -- would back me up . . .

(TR2: 43-44.)

Defendants also testified that they relied on statements on Banque Pictet's website or other promotional materials indicating that the Individual Plaintiffs are personally responsible for Banque Pictet's liabilities in concluding that they were customers of the Individual Plaintiffs. (*See, e.g.*, TR2: 8-9; Def. Exs. 34, 47.) Nothing about the substance of these marketing statements warrants the disregard of the existence of this Swiss bank. *See e.g., Ayco Co. v. Becker*, 2011 WL 3651027, at *5 (N.D.N.Y. Aug. 18, 2011) (declining to pierce the corporate veil and noting that purported alter-ego's "participat[ion] in a highly regulated industry that requires strict compliance with FINRA rules" weighs against finding the "type of day-to-day control that is required to disregard the [FINRA member's] distinct identity."). Moreover, the testimony showed that the Individual Partners are personally liable only in the event Banque Pictet is rendered insolvent. (TR1: 237-38.)

Defendants place great weight on evidence showing that before the Trusts' accounts were opened at Banque Pictet, their applications first had to be presented to the "salon," a meeting at which typically one or two Individual Plaintiff representatives were present. (TR1: 209.) As a routine part of account-opening, due diligence managers and relationship managers at Banque Pictet would present new accounts to the salon, consisting normally of a group of high level executives at the bank and one or two of the Individual Plaintiffs, to flag potential commercial or reputational risk. (*Id.*) For "plain vanilla," "easy" applications like those presented by Defendants, accountholder names are simply read aloud and "vetoes" from Individual Plaintiffs or others "almost never happen[]." (TR1: 211.) Nothing about this routine administrative

process somehow permits disregarding the existence of the Swiss Bank or renders the Defendants customers of the Individual Plaintiffs.

Finally, Defendants rely on two Eleventh Circuit decisions to support their assertion that the Trusts are "customers" under FINRA rules. Specifically, Defendants point to *Multi-Financial Securities Corp. v. King*, 386 F.3d 1364 (11th Cir. 2004) (TR2: 111) and *MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340 (11th Cir. 2004) (TR2: 115). In *King*, it was undisputed that a registered representative of a FINRA member had actually provided investment advice (and sold unregistered securities) to the defendant. 386 F.3d at 1365. The *King* court held that, even though the defendant dealt with the FINRA member's representative and not with the FINRA member itself, the FINRA member could be compelled to arbitrate. *Id.* at 1371. In *Bornstein*, a FINRA member's registered representative went to an investor's home and provided investment advice. As in *King*, the *Bornstein* court reached the conclusion that the FINRA member must arbitrate despite the fact that the investor was clearly a "customer" of its registered representative. (*Id.* at 1341) (noting that the FINRA member's representative went to the investors' home to provide investment advice). As one court has since observed:

> In *King* and *Bornstein*, the issue was whether the broker-dealer would be compelled to arbitrate when its admitted agent or representative (associated person) sold securities not issued, marketed or approved by the broker-dealer to customers of the associated person. The issue in both turned on whether the customer of an associated person is also the customer of the broker-dealer who supervised the associated person, even if the broker-dealer had no knowledge of the transaction. In both cases, the broker-dealer was compelled to arbitrate because the court ultimately found that the investor was a customer of both the associated person and the broker-dealer.

*AXA Distribs., LLC v. Bullard*, No. 1:08–CV–188–WKW, 2008 WL 5411940, at *7 n. 16 (M.D. Ala. Dec. 24, 2008). Here, Defendants were allegedly defrauded by Callahan, who was never a representative of POI, Banque Pictet or the Individual Plaintiffs. And none of the Plaintiffs

provided investment advice or sold securities to Defendants.

    2.    <u>The Individual Plaintiffs are not Associated Persons of POI</u>

Even if Defendants were FINRA "customers" of the Individual Plaintiffs, FINRA Rule 12200 would not require arbitration because the Individual Plaintiffs are not associated persons of POI. Under FINRA Rule 12100(r), the term "associated person" or "person associated with a member" means:

> (1) A natural person who is registered or has applied for registration under the Rules of FINRA; or (2) A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA.

(*See* Pl. Ex. 28.)

Defendants contend that the Individual Plaintiffs are associated persons of POI because they are natural persons engaged in the investment banking or securities business in Switzerland (through Banque Pictet) and that they indirectly control POI by virtue of their 12.5% ownership interest in its parent company, Sopafin. (TR2: 132-33). The Court rejects Defendants' assertion. Mr. Lê, Chief Compliance Officer of POI, testified that the Individual Plaintiffs have no involvement whatsoever in the business of POI, so there is no *actual* control exercised over the broker-dealer. (TR1: 32.) And while Defendants emphasize POI's disclosure of the Individual Plaintiffs as "control persons" on their SEC Form BD, Mr. Lê testified that this disclosure was made in the interest of transparency, based on the definition of "control" as used specifically for Form BD, and solely for the purposes of Form BD. (TR1: 60, 70.) Mr. Marc Menchel, a former general counsel of FINRA, testified that listing someone as a "control person" on a Form BD disclosure does not transform that person into an associated person under FINRA rules, and that

such listing appears to have been an error. (TR1: 181.) The Court finds the testimony of these witnesses credible.

Second, the evidence shows that the Individual Plaintiffs never were involved in the securities business of POI. Mr. Menchel testified that in order for an individual to be considered an associated person of a member under FINRA rules, he or she must have involvement in the business of the FINRA member. (TR1: 166 (explaining that the "industry standard is clearly [an associated person is] involved in the business of the member").) The Individual Plaintiffs had no such involvement.

*Sykes v. Escueta* supports Mr. Menchel's testimony. 2010 WL 4942608 (N.D. Cal. Nov. 29, 2010). In *Sykes*, the defendants brought a FINRA arbitration claim against a broker-dealer, and also named an indirect owner of the broker-dealer as a respondent, asserting that he was an "associated person" of a FINRA member by virtue of his purported "control" over the broker-dealer and his general involvement in the securities business. *Id*. at *3. The indirect owner (Sykes) moved for an injunction, which the court granted. The *Sykes* court explained:

> Defendants argue that Rule 12100(r)(2) should be interpreted to confer "associated person" status on anyone who is both (1) engaged in the investment banking or securities business and (2) directly or indirectly controlling a FINRA member. Defendants present evidence in the form of FINRA BrokerCheck reports and news articles that Sykes was engaged in the investment banking and securities business, and argue that this, when taken with Sykes' indirect ownership of GAF, is sufficient to satisfy Rule 12100(r)(2). Defendants cite to no cases in support of this interpretation, and cite no cases in which a Court compelled a non-FINRA member to participate in arbitration.
>
> The Court finds Defendants' proposed interpretation of the FINRA Code is implausible and unsupported by the law. As the Court has stated, FINRA's power to compel parties to arbitrate must be rooted in some contract. Defendants' proffered interpretation would eviscerate this requirement; Defendants essentially ask the Court to find that FINRA has the authority, through its arbitration

> code, to establish the outer jurisdictional limits of its arbitration proceedings.
>
> A more plausible reading of Rule 12200 is that any FINRA member can be compelled to arbitrate a claim if there exists a dispute between a customer and a person associated with the member, and if the dispute arises in connection with the business activities of the member or the associated person. Under this reading, Rule 12200 does not define the class of individuals that FINRA can compel to arbitrate; rather, it defines the range of disputes FINRA can compel its members to arbitrate.

*Id*. at *3. Based on the rationale in *Sykes*, the Individual Plaintiffs cannot be compelled to arbitrate, based solely on an indirect ownership interest in a FINRA member and an alleged, unrelated involvement in the securities industry. They are not associated persons of POI.

               3.       The Dispute Does Not Arise from the Business Activities of POI

Finally, the present dispute is not arbitrable under FINRA Rule 12200 because it does not arise from the business activities of a FINRA member. As the *Sykes* court noted, FINRA Rule 12200 does not define a class of individuals who must arbitrate, but rather a class of disputes that must be arbitrated. *Id*. A dispute is not subject to mandatory arbitration under Rule 12200 unless it arises in connection with the business activities of the member or the associated person. (*See* Pl. Ex. 28.)

In *Valentine Capital Asset Management, Inc. v. Agahi*, a California appellate court considered this precise issue with respect to FINRA Rule 13200, which is nearly identical to Rule 12200 but governs disputes between FINRA members. 174 Cal. App. 4th 606 (Cal. Ct. App. 2009). Like Rule 12200, Rule 13200 requires arbitration only if the dispute arises out of the business activities of an individual or an associated person of a FINRA member. *Id*. at 616. The court in *Valentine* held that, "common sense dictates that the phrase 'business activities of ... an associated person' must have *some* limitation" (*Id*. at 615) (emphasis in original). The *Valentine* court explained:

14

>Indeed, a variety of disputes, utterly unrelated to the securities industry, might arise between individuals who happen to be associated persons. For example, a registered representative might also be a real estate agent who sells a home to another person who happens to be a registered representative. Other registered representatives, engaged in the side business of collecting and selling art, might become embroiled in a dispute over the sale of a painting that one claims to be fake. These disputes would certainly arise out of the parties' business activities, but neither the parties nor FINRA would reasonably expect these private disputes to be appropriate for an arbitration established as part of the regulation of stock brokerage firms. While these types of non-investment disputes may be relatively unlikely, the construction of Rule 13200 must nonetheless countenance the possibility. Without an appropriate limit on the concept of "business activities," FINRA would be forced to handle disputes outside its purpose and concerns, beyond the expertise of FINRA arbitrators, and beyond the reasonable expectations of the parties involved.
>
>Since there must be some limit to the scope of "business activities" subject to mandatory arbitration under FINRA, we must next find an appropriate means of defining the limitation. We need look no further than the words of Rule 13200 itself. The mandate to arbitrate disputes arising out of "business activities of . . . an associated person," reasonably read, must require arbitration of disputes only if they arise out of the business activities of an individual *as* an associated person of a FINRA member. With this interpretation, FINRA and the registered representatives under its jurisdiction are assured that arbitration will pertain to matters with some nexus to the activity actually regulated by FINRA. This is nothing more than the common sense meaning of the plain language contained in Rule 13200, and any other interpretation would wrongly strip individuals of their civil jury trial rights concerning subject matter in which FINRA maintains no regulatory interest.

(*Id*. at 615–16) (emphasis in original).

In this case, the dispute arises from Defendants' custodial bank accounts, opened with and maintained by Banque Pictet in Switzerland. POI is not even licensed to engage in such business, and that Banque Pictet's custodial business is not regulated by FINRA. Thus, the dispute does not arise from the business activities of a FINRA member, here POI, or the business activities of the Individual Plaintiffs as associated persons of POI. Thus, the Court finds that this

dispute is not arbitrable under FINRA Rule 12200.

### C. Declaratory Judgment

Plaintiffs seek a declaratory judgment that Defendants do not qualify as "customers" of Plaintiffs within the meaning of FINRA Rules and that the Arbitration is improper. Pursuant to 28 U.S.C. § 2201, the Court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Here, the parties are interested because there is an existing and pending arbitration claim before FINRA. As outlined above, Defendants claims are not arbitrable. The declaratory relief requested by Plaintiffs is therefore properly granted.

### III. CONCLUSION

Accordingly, after due consideration, it is **ORDERED, ADJUDGED and DECREED** as follows:

Having found in favor of Plaintiffs on its claim for a permanent injunction, Defendants are **BARRED AND PERMANENTLY ENJOINED** from prosecuting the Arbitration against Plaintiffs.

The Court finds in favor of Plaintiffs on their claim for declaratory judgment. The Court finds and declares that Defendants are not customers of any of the Plaintiffs under the FINRA Rules. The Court also finds and declares that Defendants' claims in the Arbitration are not arbitrable against Plaintiffs.

The Clerk shall close the case and all pending motions are denied as moot. The Court

retains jurisdiction over this action to assess costs.

DONE AND ORDERED in chambers at West Palm Beach, Palm Beach County, Florida this 14th day of April, 2017.

_____
KENNETH A. MARRA
United States District Judge